UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
LEINER HEALTH PRODUCTS, INC.,   .    Case No. 08-10446(KJC)
*et al.*,                       .    (Jointly Administered)
                                .
          Debtors.              .    April 8, 2008 (1:35 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.  Please be seated.

2          THE COURT: Good afternoon, all.

3          MR. SASSOWER: Good morning, Your Honor - Good

4    afternoon, Your Honor.  Edward Sassower of Kirkland & Ellis

5    on behalf of the debtors, and I'm here today with my

6    restructuring partners, Paul Basta and Steve Hessler, and my

7    litigation partner, Mark McKane.  Also in the courtroom with

8    us today are Robert Reynolds, the company's president and

9    CEO, Andrew Morrow of Houlihan Lokey, the debtors' financing

10   advisor, and Doug Friske of Towers Perrin, the debtors

11   compensation consultant.  All three of these gentlemen are

12   prepared to testify today in support of the relief requested.

13   Your Honor, initially there were 22 motions scheduled for

14   today's hearing, however, the majority of these motions were

15   unopposed and have already been approved, and we thank Your

16   Honor for making that possible by receiving and processing

17   our certifications of no objection and our certifications of

18   counsel prior to today's hearing.  We did receive a handful

19   of objections from the Office of the United States Trustee

20   and the Unsecured Creditors Committee.  We have worked

21   diligently to resolve those objections and are pleased to

22   inform the Court that we have resolved all of the Trustee's

23   objections and the overwhelming majority of the Committee's

24   objections.  Your Honor, per the Local Rules, the agenda is

25   listed in the order of when the pleadings were filed, but

1    with your permission, I'd like to go out of order to address

2    the contested matters first.

3              THE COURT: Go ahead.

4              MR. SASSOWER: Thank you, Your Honor.  Your Honor,

5    the first item I'd like to address is item number 16 on the

6    agenda, which is the DIP motion.  Notice of this motion was

7    served on the debtors' core list and the debtors' 36 lien

8    holders and commercial landlords.  The debtors' core list

9    consists of the debtors' top 30 creditors, counsel to the

10   agent for the pre-petition and post-petition lenders, counsel

11   for the equity sponsors, counsel for the ad hoc group of the

12   debtors' senior subordinated noteholders, the debtors' bank,

13   Wells Fargo, all the relevant federal government entities,

14   including the U.S. Trustee, the IRS, and the SEC, DOJ, and

15   the FDA, all relevant Delaware state offices and all entities

16   that filed a notice of appearance in this case.  Your Honor,

17   as a preliminary matter, I would like to incorporate into

18   today's record Mr. Reynolds' first day affidavit and Mr.

19   Morrow's testimony which was proffered by Mr McKane at the

20   first day hearing.

21             THE COURT: Very well.

22             MR. SASSOWER: Thank you, Your Honor.  Your Honor,

23   as established through such testimony, the debtors commenced

24   these Chapter 11 cases in the midst of a severe liquidity

25   crises.  To that end, the debtors are seeking authorization

1   to use cash collateral and obtain a $74 million DIP loan on a

2   super-priority administrative claim and priming lien bases.

3   At the first day hearing, Your Honor approved interim

4   borrowings under this loan amount to an amount not to exceed

5   $20 million.  The debtors' pre-petition secured lenders did

6   not file an objection to the proposed DIP loan.  Many, but

7   not all of the pre-petition lenders, are also DIP lenders.

8   However, as I confirmed at the first day hearing, this is not

9   a roll-up.  The entire DIP loan represents new capital.  The

10  Official Committee of Unsecured Creditors did file an

11  objection to the DIP loan requesting specific modifications.

12  In an effort to resolve this objection, the debtors and the

13  post-petition lenders have agreed to make various

14  modifications, which I'll list for you now.  First, the post-

15  petition lenders have agreed to eliminate the request for a

16  lien on avoidance actions.  Second, the lenders have agreed

17  to eliminate the request for a lien on the proceeds of any

18  surcharge pursuant to § 506(c) of the Bankruptcy Code.

19  However, the DIP financing does contain a limited waiver of

20  § 506(c) to the extent that the post-petition lenders are

21  providing DIP financing and the pre-petition lenders are

22  consenting to use of cash collateral.  It's my understanding

23  that the Committee has withdrawn their objection to this

24  limited 506(c) waiver.  Third, the secured lenders have

25  agreed to allow the Committee to reserve its rights to

1    request the Court to require marshaling with respect to the

2    application of proceeds received from the sale of the

3    Canadian assets.  Essentially, pumping this issue till such

4    time as we know as to whether or not the Canadian assets will

5    be sold separately from the rest of the estate.  I believe

6    the Committee still has an issue with this provision.  Four,

7    per the request of the Committee, the debtors are willing to

8    extend the sale process by two weeks.  I'll address those

9    specific dates in the context of the bidding procedures

10   motion.  And five, the Committee wanted clarification that if

11   they file their motion seeking standing to pursue claims

12   against the bank agents on or before the objection deadline,

13   that will not be deemed late.  It will be agreed as such.

14   Your Honor, I believe that leaves us with two outstanding

15   objections, and we can address these one at a time, and I can

16   cede the podium after the first objection to the Bank Group

17   and the Committee to discuss or I can go through both of

18   them.  Whatever Your Honor prefers.

19            THE COURT: Tell me what they are.  Give me the

20   universe.

21            MR. SASSOWER: Sure.  The first is that the

22   Committee argues that the cost of the DIP financing is

23   excessive, and second, I believe the Committee is still

24   arguing that the debtors have encumbered previously

25   unencumbered property and that is improper.

1          THE COURT: Okay.

2          MR. SASSOWER: With respect to the first objection,

3    that the cost of the DIP financing is excessive,

4    specifically, the Committee alleges that the annualized rate

5    of interest on the facility, including the fees, could be

6    higher than 50 percent of the DIP facility.  Mr. Morrow of

7    Houlihan Lokey is here today to testify again, if necessary,

8    that the debtors could not obtain a sufficient DIP loan on

9    better terms.  Moreover, Mr. Morrow is prepared to testify to

10   the Committee's calculation.  If called to testify, Mr.

11   Morrow would explain that the debtors project to borrow

12   approximately $52 million under the DIP facility for which

13   they'll pay approximately $5.3 million in fees and interest,

14   which is a far cry from 50 percent.  The Committee did a few

15   things to juice the percentage to get it up to 50 percent.

16   First, rather than using the amount of capital that the

17   bank's reserving, $75 million, or the projected total

18   borrowings under the DIP facility, $52 million, they used the

19   projected average borrowing over the course of the loan,

20   which is approximately $26 million.  This is going to take

21   some time for the debtors to get up to $52 million.  Second,

22   they annualize the fees, which in the debtors' view doesn't

23   make sense because the fees are a one-time cost that needs to

24   be paid whether this is a four-month loan or a one-year loan,

25   and lastly, as I stated at the outset, this is the best DIP

1    that the debtors could achieve under the circumstances, and

2    the banks have refused to consider lowering the price of this

3    DIP loan further.  With that, I can cede the podium to the

4    Committee and the Banks or I can move onto the second

5    objection.

6              THE COURT: Why don't you address the second

7    objection.

8              MR. SASSOWER: Sure.  Your Honor, the second

9    objection is that the Committee argues that the DIP lenders

10   shall not receive liens on property that were uncovered prior

11   to the petition date.  They're effectively two pools of

12   previously unencumbered assets.  There are the avoidance

13   actions and then there's one-third of the stock in the

14   Canadian non-debtor subsidiaries.  As I previously mentioned,

15   the debtors have agreed to forego liens on the avoidance

16   actions and have agreed to allow the Committee to preserve

17   its rights to request that the Court require marshaling with

18   respect to application of the proceeds from the sale of the

19   Canadian assets.  To be clear, the Canadian assets only

20   secure the new loans.  There's no cross-collateralization.

21   The debtors believe that this effectively resolves the issue.

22   In any event, the DIP lenders are not prepared to go further

23   than this, and this provision is necessary to obtain the DIP

24   loan.  There was some back and forth between the debtors and

25   the Committee and the bank group just prior to Your Honor

1   entering the courtroom, so I believe that's the current state

2   of play, but maybe when I cede the podium, I'll be proven

3   wrong.

4           THE COURT: Well, before you do, let me just ask

5   whether there are any other objections remaining by any other

6   party with respect to the financing motion?

7           MR. SASSOWER: There are - There was some joinders

8   filed, and I believe those parties are going forward.  Also,

9   we received an objection from Raymond Leasing Corporation

10  arguing that they're being primed by the DIP facility.

11  Pursuant to the form of DIP order, Raymond Leasing Corp. is

12  listed on Schedule 6.02(c) as an existing lien holder, and

13  therefore not being primed.  However, that schedule may be

14  incomplete.  We resolved this objection by agreeing to state

15  on the record that to the extent Raymond Leasing Corp. has a

16  valid perfected pre-petition lien, it will not be primed, and

17  that we will amend section 6.02(c) to make sure that it

18  includes all Raymond Leasing Corp.'s liens.  Also, in

19  connection with the Committee's objection to the DIP lenders

20  encumbering previously unencumbered property, this also has

21  to do with the fact that the rent is for party claim to the

22  DIP lenders which the Committee thinks defeats any benefit of

23  the DIP lenders foregoing a lien on the claim.  I think

24  that's all, Your Honor.

25          THE COURT: All right, what about Dr. Reddy's

1   joinder?

2        MR. SASSOWER: I understand from the Committee

3   counsel that Dr. Reddy is joining into the Committee's

4   objection to the DIP, but I'm not sure they're planning on

5   speaking individually.

6        THE COURT: All right, thank you.

7        MR. AUSTIN: Your Honor, for the record, I'm Jess

8   Austin of the firm of Paul Hastings Janofsky & Walker on

9   behalf of both the DIP lenders and the agent for the DIP

10   lenders as well as the agent for the pre-petition lenders.

11   I'd like to address ultimately what are the objections to the

12   DIP financing from the Creditors Committee, and I think we'd

13   ask the Committee to let us know if, as Mr. Sassower outlined

14   it, they are the objections, but I did want to clarify at

15   least at this point, there are two other creditors, Wilson

16   Iron Works, Inc., and J.P. Weaver, that at least contacted us

17   or advised us that they were in the same category as Raymond

18   Leasing, Your Honor, and we will clarify in - I think we've

19   already proposed a clarification of the order that we

20   certainly are not attempting to prime any properly asserted

21   or perfected security interest in other assets.

22        THE COURT: All right.  Let me hear from the

23   Committee.

24        MS. LEVINE: Good afternoon, Your Honor, Sharon

25   Levine, Lowenstein Sandler for the Official Committee of

1  Unsecured Creditors.  First, Your Honor, we're mindful of the

2  fact that we filed some substantial objections and that there

3  has been substantial progress made both by the debtor and

4  through concessions from the DIP lenders, and we do

5  appreciate that.  The problem that we're confronted with

6  right now, however, is that the last two objections from the

7  Committee's standpoint are basically the heart of the issue

8  as we see it.  We have an ability, as we stand right now, to

9  potentially see a recovery, and if it becomes appropriate, we

10  have Conner Tully (phonetical) from FTI who can testify,

11  although we'd have to close the courtroom because some of the

12  information we did get pursuant to confidentiality

13  agreements, who would testify that there is a potential here

14  for, given the facts of this case, not a distribution that

15  shouldn't be ignored based upon the Canadian assets that are

16  currently, according to the debtor, unencumbered.  In

17  addition to that, the Committee is reluctant at this point in

18  time, especially without an analysis to give up any rights to

19  the avoidance power actions.  We understand that the lenders

20  have given up a lien on the avoidance power actions, however,

21  they are still seeking a super-priority administrative

22  expense claim on all of the debtors' assets, which in our

23  mind, in the event of a deficiency claim, is tantamount to a

24  lien on all of those assets because they would necessarily

25  come ahead of anybody else in the case, once they paid

1    themselves off on the DIP loan.  Basically, what's going on

2    here is we are moving forward with the Chapter 11 case in the

3    hopes of maximizing asset values in a context that will allow

4    the lenders to acquire enough value post-petition in order to

5    negotiate successfully with the Committee, hopefully, towards

6    a consensual plan.  However, we are not there yet, and giving

7    up what is now potentially our only recovery in the case at

8    this point in time, makes the Committee, obviously, very

9    uncomfortable.  The lenders have argued that it wouldn't

10   really be the Committee giving anything up because with

11   regard to Canada, at least, we can argue marshaling.  If we

12   understand marshaling correctly, Your Honor, what it says is

13   that the pre-petition lenders would have their collateral.

14   The post-petition lenders would have their collateral, and as

15   we understand marshaling, if the post-petition lenders are

16   under-secured, they first have to look to assets that would

17   not otherwise be available to the pre-petition lenders.  So

18   by giving us marshaling, they're actually telling us we're

19   going to go after Canada first, which we find to be something

20   that's not persuasive.  With regard to the avoidance power

21   actions, while they haven't argued for marshaling there, we

22   still have the same problem that the super-priority

23   administrative expense claim potentially wipes out any

24   existing recovery.  Finally, Your Honor, with regard to the

25   cost of the loan, again, we have FTI here.  If we need to, we

1   can offer that testimony.  We're not sure that there's

2   actually a dispute on the facts other than how they are

3   interpreted.  FTI helped us put together a chart which we've

4   included as Exhibit A to our objection which basically shows

5   that if you fold in the cost of the loan and the cost of the

6   interest, despite the adjectives that were used by debtors'

7   counsel, it ultimately does come up to a cost of between 24

8   and 50 percent, and we respectfully submit that even in this

9   market, given that we have the pre-petition lenders and the

10  post-petition lenders being the same group, that that for

11  this particular case is excessive, and we would respectfully

12  submit, Your Honor, that the Committee has made substantial

13  progress with regard to many of the issues that we spotted

14  and were able to resolve them, but with these particular

15  issues, we would very much appreciate the Court's help in

16  putting together a solution here that would not obviate our

17  current ability to have a distribution in exchange for a

18  future hope that at some point in time these assets create

19  different and better value, which encourages the lenders to

20  give us something.

21          THE COURT: Well, in the courtroom, we're pretty

22  much limited to one method of coming to a solution, that is

23  for me to hear evidence and make a decision upon the record

24  that's made.

25          MS. LEVINE: And to the extent the Court thinks that

1  appropriate, we will offer Mr. Tully.

2          THE COURT: All right, thank you.

3          MS. LEVINE: Thank you.

4          THE COURT: Are there any other parties who wish to

5  be heard in connection with the financing motion?

6          MR. AUSTIN: Again, Your Honor, Jess Austin on

7  behalf of the pre-petition lenders.  Certainly to the extent

8  that evidence is being presented by the Committee, we reserve

9  the right to at least examine their witness.  I think the

10  evidence that was presented at the first day and I believe

11  will still remain uncontroverted is that pricing on this -

12          THE COURT: Oh, evidence presented on the first day

13  usually is uncontroverted.

14          MR. AUSTIN: Well - I understand, Your Honor, and I

15  think it will stay that way through the day, but from the

16  standpoint of the price and we think that the pricing is not

17  as exorbitant as the Committee would assert, and we think

18  it's appropriate under the circumstances because what you

19  have here is a circumstance where the lenders here are

20  advancing true new dollars, and we'll be prepared to address

21  that point.  We'll also be prepared to address her arguments

22  about encumbering unencumbered property because, again, in

23  this instance, to provide these debtors with the maximum

24  availability, certainly there had to be an advance, a

25  borrowing base to use the Canadian's subsidiaries assets,

1   although we noted earlier that at least the stock and the

2   value of that company and those subsidiaries are at least

3   lean to pre-petition lender's benefit, 65 percent of that

4   stock.  So, to the extent there was, quote, "unencumbered

5   value" it was only a third, but here we're actually providing

6   an entirely new separate credit facility.  The debtors, I

7   believe, are allowed to use their assets as they think best

8   in the bankruptcy proceeding to maximize the value for

9   potentially all creditor constituents.  Ms. Levine is correct

10  that at this point we do not have an agreement between the

11  senior lenders and the Creditors Committee as to what

12  distribution there may well be for the Committee or the

13  general unsecured creditors, but the senior lenders are still

14  quite mindful of this Court's admonition from the very first

15  day that to actually get a sale approved there will need to

16  be, as this Court said, a confirmable plan with distribution

17  to unsecured creditors.  We certainly interpret that to say

18  admin claims are covered and something is indeed distributed

19  to lower-level creditors.

20        THE COURT: I view that the same way.

21        MR. AUSTIN: From that standpoint, Your Honor, you

22  know, it's early in the process, we would submit that to try

23  and hold the DIP financing hostage at this stage and in hopes

24  is going to then prevent anyone in this case from ultimately

25  getting any distribution in the case.  So, to the extent

1   there's going to be some evidentiary presentation, I think we

2   should proceed with that.

3         MR. SASSOWER: Your Honor, if we're going to proceed

4   with an evidentiary hearing, we request that we have the

5   opportunity to first call Mr. Morrow to the stand.

6         THE COURT: Well, let me ask you this: What else do

7   we need to address?  How involved on the other matters are

8   those hearings?  I mean, I would be inclined to leave the

9   most lengthy part of the proceeding until last -

10        MR. SASSOWER: Sure.

11        THE COURT:  - and clear out other things first, if

12  we can.

13        MR. SASSOWER: We've been able to, I believe,

14  resolve all, if not all of the objections to the remaining to

15  the motion, so I expect the rest of the hearing to go pretty

16  quickly.  So, if you'd like, we could table this issue and

17  proceed to the other motions.

18        THE COURT: Let's do that.

19        MR. SASSOWER: Okay.

20        THE COURT: Assuming that doesn't create other

21  problems.

22        MR. SASSOWER: Your Honor, I would next like to

23  proceed to matter 22 on the agenda, which is the bidding

24  procedures motion.  Your Honor, this motion was also served

25  on the core list as well as the debtors' 36 lien holders and

1   commercial landlords.  Your Honor, the Committee filed an

2   objection to this motion, and the debtors have essentially

3   granted everything they've asked for.  Specifically, they

4   asked for the sale timeline to be extended.  At the request

5   of the Committee, the debtors have agreed to extend the sale

6   process from 90 days to 110 days.  Specifically, the new bid

7   deadline will be May 30th.  The debtors shall make a

8   determination regarding whether a bid is a qualifying bid and

9   shall notify bidders whether their bids have been determined

10  to be qualified by June 6th.  The auction will take place on

11  June 9th.  We would request a sale hearing on or around June

12  11th, subject to the Court's availability, and the closing

13  would be in mid-June, but not later than June 30th.

14  Additionally, the Committee wanted to be assured they will be

15  consulted at various stages through the sale process, such as

16  at the time we're determining who is a qualified bidder, and

17  we have modified the bidding procedures order to provide for

18  such.  The Committee also wanted the cash deposit to be

19  decreased from 10 percent to 5 percent, and the bid increment

20  to be decreased from $500,000 to $250,000, and the debtors

21  and the banks have agreed.  The Committee also wanted to

22  modify section 8.7 of the asset purchase agreement to provide

23  the Committee shall also be provided with access to the

24  selling debtors' books and records post-closing, and the

25  debtors have agreed to that as well.  There was one final

1   objection which just got resolved a few minutes ago, and that

2   is the Bank Group has now agreed that if they have submitted

3   a credit bid which is outstanding then they will refrain from

4   the bidding qualification and evaluation process.  Instead

5   the debtors shall provide a DIP facility agent and the agent

6   to the Bank Group with the synopsis of the bids as soon as

7   reasonably practical after the bid deadline but before June

8   8th.  The synopsis shall include the name of the bidding

9   entity, the proposed purchase price, and all other material

10  terms and conditions of the proposed bid.  If the Bank Group

11  does not have an outstanding credit bid, the debtors shall

12  provide copies of the bids and elicit parties submitting bids

13  after the bid deadline, and this language is acceptable to

14  the Committee.  With that, I think that resolves all the

15  outstanding objections to this motion.

16          THE COURT: Does anyone else care to be heard in

17  connection with this motion?

18          MS. LEVINE: Yes, Your Honor, just briefly.  I think

19  the debtor didn't take credit for two other issues they've

20  resolved.  Another issue that the Committee had with regard

21  to the bidding procedures motion was that no proceeds get

22  released, which was originally provided for in the bidding

23  procedures motion.  We've now reached agreement that the

24  issue with regard to whether or not sale proceeds get

25  released will be saved for everybody until the sale hearing

1    and not be addressed now.  Second, there was a question with

2    regard to whether or not the bidding procedures order

3    impacted the purchase price allocation and whether or not

4    that would be fixed or something we could address at the sale

5    hearing.  That will now be addressed at the sale hearing as

6    well.  Thank you, Your Honor.

7         THE COURT: Does anyone else care to be heard?  I

8    hear no response.  Do you have a form of order?

9         MR. SASSOWER: Your Honor, the proposed orders are

10   in a bit of state of flux because of all the negotiating that

11   was being done this morning, so I propose that we submit all

12   of them at the end of the hearing, if that's okay with Your

13   Honor.

14        THE COURT: Very well, that's fine.

15        MR. SASSOWER: Your Honor, I would next like to turn

16   to item 19 on the agenda which is one of the bonus motions,

17   and this motion was also served on the core list.  Your

18   Honor, this motion seeks approval of four bonus programs: A

19   management-incentive program which provides quarterly

20   incentive-based bonus to 27 key personnel based on whether

21   the debtors meet a threshold target or upside EBITDA goal set

22   by the Board of Directors.  A modified bonus plan which

23   provides semi-annual incentive-based bonuses for 170

24   executives, directors, and managers or senior level technical

25   professionals based on the debtors' EBITDA and individual

1    performance objectives.  The quality leadership bonus plan

2    which provides annual performance-based bonuses for 3 vice

3    presidents in the Quality and Compliance Divisions.  And the

4    Garden Grove Award Program which is a one-time performance

5    program that provides potential bonuses to 36 employees based

6    on dedicated overtime and weekend support as well as meeting

7    a key volume production goal.  Your Honor, the trustee filed

8    an objection to this motion seeking additional information on

9    the four plans.  The Committee filed a one-page joinder in

10   support of that objection.  The debtors have provided the

11   requested information to both the Trustee and the Committee,

12   and the Trustee has informed the debtor that this resolves

13   his objection.  Your Honor, all four of these programs are

14   not retention or severance programs, but rather incentive-

15   based programs.  The legal standards for governing this

16   motion are the business judgment standard and the facts and

17   circumstances standard of § 503(c)(3).  The evidence

18   supporting this motion is the Friske declaration and both the

19   first day Rob Reynolds declaration as well as the declaration

20   of Rob Reynolds submitted in support of this particular

21   motion, and that evidence supports that these programs are

22   both reasonable in scope and necessary to the success of

23   these Chapter 11 cases.  I don't believe there are any

24   remaining objections to this motion and would respectfully

25   submit that this motion be approved.

1          THE COURT: Okay.  Let me ask if anyone else cares

2     to be heard in connection with this motion.  I hear no

3     response.  I've reviewed the submissions and don't have any

4     questions.

5          MR. SASSOWER: Thank you, Your Honor.  Your Honor, I

6     would next like to turn to matter 20 and 21 on the agenda

7     which is the asset sale bonus motion and a motion to file the

8     Morrow declaration under seal in connection with this motion.

9     We'll first turn to the under seal motion and for that I'll

10    cede the podium to my partner, Mr. McKane.

11         MR. McKANE: Good afternoon, Your Honor.

12         THE COURT: Good afternoon.

13         MR. McKANE: I believe that there were objections

14    raised to two aspects of two motions that were filed under

15    seal.  One as it related to Houlihan Lokey's fee application

16    and one that related to this pending motion and just for

17    convenience purposes, we have resolved both issues with the

18    U.S. Trustee and in exchange for that resolution we agreed to

19    make the following statement on the record publicly at this

20    time with the recognition that at the end of the asset sale

21    process at a mutually agreeable time with us and the U.S.

22    Trustee, we will release the seal as it relates to the Morrow

23    affidavit for the asset sale bonus motion.  With regards to

24    the Houlihan Lokey fee application, the structure of the

25    transaction fee has changed as a result of the negotiation,

1  and the low end has been reduced substantially.  The new

2  structure incentivizes Houlihan Lokey to reach for the upper

3  end in values.  The anticipated result will likely yield a

4  fee below or equal to the original $3.5 million fee, but it

5  is possible that the fee could exceed $3.5 million if an

6  extraordinary result is achieved.  Now, with regards to the

7  asset sale bonus compensation, the low end of the management

8  bonuses is zero.  There is no guaranteed amount.  A favorable

9  result would result in management bonuses of 3.5 million to

10 $4.5 million, but it is possible that the bonuses could

11 exceed such amounts if an extraordinary result is achieved.

12 And with that, we believe we have resolved the questions and

13 objections as it relates to the motions under seal.

14       THE COURT: Does anyone else care to be heard in

15 connection with either of these motions?  I hear no response.

16 I have no questions.  I've reviewed the submissions.

17       MR. SASSOWER: Thank you, Your Honor.  Having dealt

18 with that threshold issue, I'll now turn to the substantive

19 matter, matter 21, which is the asset sale bonus motion.

20 Your Honor, the asset sale incentive program provides a bonus

21 payment for 10 members of the debtors' senior management team

22 upon the completion of an asset sale if the sale

23 consideration is equal to or exceeds a certain threshold.

24 The payments pursuant to the asset sale incentive program

25 increase as the sale consideration increases.  Under the

1   debtors' original asset sale incentive program, each

2   participant received a percentage of his or her annual salary

3   upon a change of control following any sale of the debtors'

4   businesses regardless of the threshold.  Both the Trustee and

5   the Committee objected to this guaranteed minimum payout of

6   $1.87 million on the ground that it constituted a retention-

7   based bonus rather than an incentive-based bonus.  They

8   argued that unless the participant's sale bonus pool was tied

9   - rather, after negotiations with the Trustee, debtors

10  removed the minimum guaranteed payout so that the

11  participating employees will be entitled to receive a sale

12  bonus only if they equal or exceed the thresholds.  Thus, the

13  revised asset sale incentive program is clearly no longer

14  subject, if it was previously subject, to § 503(c)(1) or

15  503(c)(3)(2) but rather is now subject to 503(c)(3)(3) which

16  authorizes transfers and obligations to insiders that are

17  outside the ordinary course of business if they're justified

18  by the facts and circumstances of the case.  Moreover, the

19  participants in the asset sale incentive program have agreed

20  to (1) credit other bonuses they receive from the company

21  against the sale bonus, and (2) waive any severance they're

22  entitled to under the debtors' existing employment policies

23  upon receipt of the sale bonus.  Lastly, this morning, the

24  Committee agreed to withdraw their objection to this motion

25  in exchange for management conditioning, payment of 50

1   percent of the sale bonus over the second threshold upon the

2   confirmation of a plan of reorganization such that management

3   gets 100 percent of the bonus up to the second threshold, and

4   50 percent of the bonus after the second threshold,

5   regardless of a confirmation of a plan, however, 50 percent

6   of the payments they'd be due after the second threshold

7   would only be paid to management if a plan is confirmed in

8   these cases.  I believe that resolves the remaining objection

9   to this motion.  The debtors have three witnesses -

10          THE COURT: I'm sorry to interrupt.  How does that

11   address, if at all, the objection that was made about what

12   happens if the lenders credit bid?

13          MR. SASSOWER: It effectively resolves it because

14   the issue with the credit bid was if they credit bid below

15   the first threshold, the Trustee and Committee argued that

16   the banks could credit bid a dollar, and they would still get

17   paid $1.87 million.  Now, if the credit bid is below the

18   first threshold, management will not receive a single penny.

19   The credit bid has to be in excess of the first threshold in

20   order for - So, the way this would work, I think in practical

21   terms, is if nobody showed up at the auction and the banks

22   credit bid, the management would not receive a sale bonus.

23   If there was an auction and the auction price exceeded the

24   first threshold and then at that point, the banks credit bid,

25   then they would receive a bonus based on the amount of that

1   credit bid which would have to exceed the previously - the

2   prior bid at the auction.  So I believe that it completely

3   resolves that issue.

4          THE COURT: All right.  Does anyone else - I'm

5   sorry, I interrupted you.  Please -

6          MR. SASSOWER: Well, I was just noting that the

7   debtors have three witnesses in the courtroom who are

8   prepared to testify if necessary that the proposed asset sale

9   program is justified under the facts and circumstances of

10  these Chapter 11 cases and support it by rational business

11  justifications.  They are: Mr. Morrow, who can testify to the

12  process of negotiating the program; Mr. Friske, who can

13  testify as to the reasonableness of the program; and Mr.

14  Reynolds, who can testify as to the necessity of the program.

15         THE COURT: All right, thank you. Does anyone else

16  care to be heard or to examine any of the witnesses that have

17  been offered?

18         MS. LEVINE: Your Honor, just one very minor

19  clarification.  At one point during counsel's presentation he

20  referred to a plan of reorganization.  It's just a plan.

21         MR. SASSOWER: Yeah.

22         MS. LEVINE: It's possible we have a plan of

23  liquidation.

24         MR. SASSOWER: Yes.  Thank you, counsel.

25         THE COURT: I'd say more likely than none.

1          MR. SASSOWER: Yeah.

2          THE COURT: All right, thank you.  All right.  I've

3    reviewed the submissions, I've heard argument of counsel and

4    upon resolution of the objections, I'm prepared to approve

5    the relief that's been requested.

6          MR. SASSOWER: Thank you, Your Honor.

7          THE COURT: All right.

8          MR. SASSOWER: Okay.  There are a few other

9    uncontested matters and some housekeeping matters that we can

10   turn to now and at this point I'd like to cede the podium to

11   my partner, Stephen Hessler.

12         THE COURT: All right, thank you.

13         MR. HESSLER: Good afternoon, Your Honor.  For the

14   record, Steve Hessler of Kirkland & Ellis on behalf of the

15   debtors.  The first item to address is listed on the agenda

16   as number 15 which had been listed as a contested motion, but

17   which we're pleased to report is the sole objection has been

18   resolved.  At the debtors' March 12th first day hearing, the

19   Court granted interim approval for the debtors to continue

20   certain ordinary and customary wage and benefits programs

21   that they have in place for their employees.  Specifically,

22   the Court also granted interim approval for the debtors to

23   continue honoring their severance obligations subject to an

24   aggregate cap of $900,000 to employees who had been laid off

25   or who have been informed they will soon be laid off, but who

1    have agreed to continue working because they're continued

2    assistance is critical to downsizing the debtors' plant in

3    Fort Mill, South Carolina and closing the debtors' plant in

4    Wilson, North Carolina.  Of the relief that the debtors seek

5    approval for on a final basis only one objection, and a

6    limited objection at that, was filed by the Committee which

7    challenged the wages motion on two specific grounds related

8    to severance.  Your Honor, the debtors are pleased to inform

9    the Court that since filing their reply to the Committee's

10   limited objection, the parties were able to negotiate a

11   resolution, therefore, on a final basis, the debtors are now

12   seeking approval for the following: First, as requested by

13   the Committee, the debtors agree not to pay severance to

14   employees who were terminated before September 10th, 2007,

15   which is 180 days before the petition date.  Second, also as

16   requested by the Committee, the debtors agree not to pay more

17   than $10,950 to any of the employees who are presently

18   receiving severance payments but who were terminated

19   pre-petition.  Your Honor, the Committee has in turn agreed

20   with the debtors' request to honor their severance

21   commitments to employees who were terminated post-petition or

22   who will soon be terminated but who continue to perform a

23   vital role in closing or transitioning the debtors'

24   facilities.  This group comprises 16 employees at the

25   debtors' Wilson plant and 38 employees at the debtors' Fort

1    Mill plant.  One caveat we should mention, Your Honor, is

2    that the debtors may need to come back and seek separate

3    relief for additional rank and file and mid-level employees

4    who may yet be terminated pre-petition - excuse me, post-

5    petition, but that no determination has been made to.  In

6    sum, Your Honor, after resolving the sole objection filed by

7    the Committee, in their proposed amended final order, the

8    debtors respectfully seek approval for an additional $1.8

9    million beyond the $900,000 already granted on an interim

10   basis to continue to honor their severance obligations

11   subject to an aggregate cap of $2.7 million, and that sum,

12   Your Honor, is $1.3 million less than the 4 million that the

13   debtors sought in their original proposed final order.

14           THE COURT: Thank you.  Does anyone else care to be

15   heard in connection with this motion?  All right, I've

16   reviewed the submissions, the resolution resolves any

17   concerns the Court had.  I'm prepared to order the relief

18   that's been requested as it's been modified.

19           MR. HESSLER: Thank you, Your Honor.  We will submit

20   an order.  Your Honor, if possible, I would like to return

21   for a moment to item number 8 on the agenda.  This is the

22   debtors' lease contract rejection motion.  Your Honor

23   approved this motion yesterday morning, however, we

24   subsequently learned that one of the parties did not receive

25   proper notice of the motion.  The debtors propose to submit

1    an amended order that omits the relevant counterparty from

2    the order.  The debtors will then utilize the expedited lease

3    rejection procedures that the Court has also ordered - excuse

4    me, that the Court has already approved to re-notice this

5    issue for the next hearing date.

6            THE COURT: That's fine.

7            MR. HESSLER: Thank you, Your Honor.  Your Honor,

8    with that, I will now cede the podium to my colleague, Brain

9    Lennon.

10           THE COURT: Very well.

11           MR. LENNON: Good afternoon, Your Honor.  Brian

12   Lennon on behalf of the debtors.  The next item on the agenda

13   is item number 18, the Houlihan Lokey retention application.

14   Houlihan Lokey has served as a financial advisor to debtors

15   in some of the largest Chapter 11 cases including Hancock

16   Fabrics, Granite Broadcasting, Eagle Pitcher Holdings.

17   Additionally, Houlihan Lokey has advised official creditors

18   committees in Merit WorldCom (phonetical) and Enron.  As a

19   result of the pre-petition work performed on behalf of the

20   debtors, Houlihan has acquired knowledge of the debtors and

21   their business and is now familiar with the debtors'

22   financial affairs, debt structure, operations, and related

23   matters.  During these cases, Houlihan will assist with the

24   evaluation of strategic alternatives and render investment

25   banking and financial advisory services to the debtors

1  including services related to the proposed sale.  The secured

2  lenders have filed a limited objection to the application.

3  Houlihan and the lenders have reached a consensual resolution

4  of that limited objection, and with Your Honor's permission,

5  I'd like to turn the podium over to Bob Brady of Young,

6  Conaway who represents Houlihan.

7           THE COURT: Very well.

8           MR. BRADY: Good afternoon, Your Honor.  Robert

9  Brady on behalf of Houlihan Lokey.  I am pleased to report,

10 Your Honor, we did resolve any issues we had with the agent,

11 and also an informal response we had from the United States

12 Trustee's Office.  So it may make sense if I hand up to Your

13 Honor a blackline of the engagement letter.  This would be an

14 unredacted blackline.  Of course the engagement letter does

15 have a portion of it that's redacted pursuant to Your Honor's

16 prior ruling.

17          THE COURT: Very well.  Thank you.

18          MR. BRADY: Your Honor, just turning to some of the

19 highlights on the revisions.  In connection with the monthly

20 fee that Houlihan will receive under this engagement, as

21 opposed to 50 percent of the monthly fee being applied

22 towards any transaction fee on the six-month anniversary,

23 that has been changed to 100 percent would be applied

24 effective June 10.  So if the sales schedule slips, then 100

25 percent of the fee would go towards the transaction fee.  In

1  connection with the restructuring transaction fee, Your

2  Honor, as debtors' counsel previously put on the record,

3  there has been a change to the structure as opposed to the

4  original fee included there is now a new minimum that is

5  substantially lower than the transaction fee in the original

6  engagement letter, but it does provide incentive compensation

7  to Houlihan if they achieve a higher result either in

8  connection with a 363 sale or a Chapter 11 plan.  There is

9  also the concept of a potential separate vita sale

10 transaction.  If that occurs then the transaction fee there

11 will be increased by an additional $400,000.  Originally, it

12 was contemplated that there was a base of 800,000 on a vita

13 sale transaction.  The fees in connection with the potential

14 financing transaction have been taken out, removed from the

15 engagement letter.  Turning to page 11, Your Honor, the

16 United States Trustee had raised an issue with the limitation

17 of liability that was in the engagement letter.  We have

18 removed the provision that provides that Houlihan's liability

19 will be capped at what they were paid under the engagement.

20 We did include language that limits the types of damages a

21 party can seek.  This language is consistent with an

22 agreement we had previously reached with the United States

23 Trustee in another case, Remey, that was before Your Honor,

24 and it's similar to the indemnification language in the plan

25 of Hollywood Standard.  It makes clear that in no event will

1   there be any limitation in connection with any fraud, bad

2   faith, self-dealing breach of fiduciary duty, gross

3   negligence, or wilful misconduct.  So, in that respect it's

4   consistent with the indemnification provision.  With those

5   changes, Your Honor, it's our understanding that both the

6   agent and the United States Trustee have no objection to the

7   form of order, and I believe debtors' counsel has a form of

8   order which the only real changes are to indicate that it's

9   approved as modified and with a modified engagement letter

10  attached.

11          THE COURT: I have one question.

12          MR. BRADY: Yes.

13          THE COURT: I see that in paragraph (6) it says,

14  "For the purpose of calculating a transaction fee, it will be

15  based upon the value of the company per court-approved

16  disclosure statement."  What happens if I approve a

17  disclosure statement but there turns out to be a valuation

18  fight at confirmation?

19          MR. BRADY: Your Honor, I think I should discuss

20  that with my clients, the people who contemplated that

21  particular event occurring.  Your Honor, we will modify the

22  engagement letter to indicate that it would be the value

23  determined at confirmation.

24          THE COURT: All right.  Thank you.

25          MR. AUSTIN: Your Honor, Jess Austin on behalf of

 1   the agent for the pre-petition lenders and the DIP lenders.

 2   The comments that were made by Mr. Brady do resolve the

 3   objections, and I did want to say the objections have been

 4   resolved which had been presented by the lenders.  The

 5   general nature of the objections were the focus of the

 6   methodology of certain of the calculation of the fee in the

 7   event there was a credit bid or a bid of less than the full

 8   value of the pre-petition lenders' claims.  The other point

 9   that came up was the issue of the circumstances when and if

10   the fee may ultimately have gotten paid.  What we did want to

11   let the Court know is that obviously and as we stated in the

12   limited objection that the lenders did support the retention

13   of Houlihan Lokey and felt they were experienced in the tasks

14   they were being asked to perform for this debtor.  With

15   respect to this engagement, one thing we did want to bring to

16   the Court's attention is that there will be an amendment to -

17   and there's been some other additional cleanup amendments to

18   the DIP loan, one of the things that we propose to do to the

19   DIP loan is an amendment that clarifies that with respect to

20   this transaction fee, that it will be - it is to be paid

21   under the circumstances of a 363 sale where there's either a

22   sale to a third party or a credit bid or a plan of

23   reorganization which implements the 363 sale or plan

24   providing for the recapitalization or restructuring of the

25   company, which may be confirmed in the case, which is either

1    with the support of the lenders or by order of the Court.

2    What we're trying to basically clarify in some of these

3    negotiations what was - because we had not completed these

4    negotiations by the time that the objection deadline had come

5    upon us, was also to be clear that if there's a straight up

6    liquidation here, there is no 363 process, then, as we

7    understood it, we did want to clarify there would not

8    ultimately be a transaction fee that may well be paid here.

9    So, we'll be making a second amendment to that to clarify

10   this points within the DIP loan itself which ultimately I

11   believe the final form of that DIP loan will be filed with

12   the Bankruptcy Court.

13          THE COURT: And, I guess, is that as a followup to

14   today's hearing or do you expect separate notice to go out on

15   that?

16          MR. AUSTIN: We will have to look at what other

17   compliance the rules we set into the DIP loan itself and the

18   order that may approve the DIP loan, Your Honor.

19          THE COURT: All right.

20          MR. AUSTIN: I know there was - we were going to

21   propose an amendment that may have complied - trying to

22   comply with some of the objections that have been resolved,

23   but that's a technicality I need to go back and review.

24          THE COURT: All right, well, let me just ask that

25   if, as a followup to today, I don't know whether we'll have

1    the DIP order today or not, if it comes in under

2    certification, the certification should - and it contains

3    that change, should explain why no further notice is

4    necessary, if it turns out to be that way.  All right.

5           MR. AUSTIN: Thank you.

6           MR. LENNON: Your Honor, I have an order approving

7    the Houlihan retention which I can hold until the end of the

8    hearing or if you'd like it now.

9           THE COURT: Let's hold them till the end -

10          MR. LENNON: Okay.

11          THE COURT: - so I can check them off one by one to

12   make sure we get them all.

13          MR. LENNON: Sounds good.

14          THE COURT: All right.

15          MR. LENNON: With that, Your Honor, I'd like to turn

16   to two housekeeping matters that relate to items number 6 and

17   7 on the agenda.  These relate to the Strom Law Firm and the

18   Covington & Burling retention applications.  We had submitted

19   certifications of no objection on Friday.  Subsequently, we

20   learned that we had to make two additional changes - or a

21   change to each of the orders.  Specifically, the retentions

22   had been approved under § 328(a) of the Bankruptcy Code.  We

23   wanted to clarify that any fee applications submitted by

24   these firms will be subject to review under § 330 of the

25   Bankruptcy Code.  Unless Your Honor has any questions, I

1   request that these amended orders be entered today and

2   replace the orders that were entered yesterday on the docket.

3           THE COURT: All right, do you have them?

4           MR. LENNON: I do.

5           THE COURT: All right, well, keep them till the end

6   and again we'll go through the list.

7           MR. LENNON: Thank you, Your Honor.

8           MR. SASSOWER: Okay, I think that leaves two

9   matters, Your Honor, one being the DIP.  The last matter is

10  the application to approve Ernst & Young.  Once we obtain a

11  supplemental date from them we'll submit their proposed order

12  with a certification of counsel.  Before proceeding with

13  testimony in support of the DIP motion, perhaps we should

14  take a five-minute recess to let the parties discuss and make

15  sure we all understand where we are at this moment.

16          THE COURT: All right, and that's appropriate I

17  think, and let me just leave you with the following comments:

18  I truthfully see the Committee's point with respect to

19  avoidance actions.  I guess with respect to the minority

20  interest in the non-debtor subs and the avoidance actions,

21  they fall into the general category of a lender wants

22  everything it can get, which is not necessarily unreasonable.

23  It just depends on what the circumstances are, and, you know,

24  I don't know how I get to the bottom of what ought to be

25  approved and not, and frankly that's not typically an

1   evidentiary hearing that takes an hour.  I have another

2   matter scheduled for 3:30 today.  So, you know, and I also

3   say to myself, what value of minority interest in these non-

4   debtor subs, I don't know.  There may be great value.  I just

5   don't know.  There's no record upon which I could presently

6   make a decision, but some discussions on those topics would

7   be appropriate during the break.  With respect to the cost,

8   you know, I don't have to remind everybody what's going on

9   now in the credit markets, and the cost of financing, whether

10  it involves, you know, the friends you already have -

11  friends, or whether it means having to find new players isn't

12  easy, and I have present pending experience with this.

13  Nothing's cheap.  If the Committee feels the debtor needs to

14  make a record on that and have its counterpoint through

15  evidence, I'll hear it.   But I haven't seen any bargains

16  lately when it comes to DIP financing, I will tell you that,

17  even for 30 days.

18          MS. LEVINE: Your Honor -

19          THE COURT: Yes.

20          MS. LEVINE: For the sake of the calendar and also

21  because we are familiar with the term "credit light to credit

22  tight", I don't think we need to have a record on the second

23  point.  The Committee does feel very strongly about the

24  Canada issue and the avoidance power issue.

25          THE COURT: All right.

1          MR. BASTA: Your Honor, I have a - would request

2     that we take a recess, because I have an idea maybe we could

3     try to resolve that issue with a few minutes' recess.

4          THE COURT: Okay, we'll take a ten-minute recess.

5          (Whereupon at 2:32 p.m., a recess was taken in the

6     hearing in this matter.)

7          (Whereupon at 3 p.m., the hearing in this matter

8     reconvened and the following proceedings were had:)

9          THE CLERK: All rise.  Please be seated.

10          MR. BASTA: Your Honor, Paul Basta from Kirkland on

11     behalf of the debtors.  I think we've resolved the last

12     issues on the DIP.  I think as the Committee indicated, I

13     don't think they're pressing their cost objection, and that

14     left the treatment of the super-priority claim as to

15     avoidance actions and the one-third of the stock of the

16     Canadian assets, and it's - the proposed resolution subject

17     to the Court's approval is as follows: As to avoidance

18     action, avoidance actions will be the last look for the DIP

19     so if the DIP is not otherwise paid in full, the proceeds of

20     the sale don't even cover the DIP.  The DIP lender can assert

21     its super-priority claim as to the proceeds on avoidance

22     actions, but if there's enough value from other assets to pay

23     the DIP in full, the DIP lenders can't come in and say, Oh,

24     well, we can look to avoidance actions for a recovery.  As to

25     Canada, essentially everybody reserves their rights.  So,

1   what would happen is, if - I think the best way to understand

2   this is with an example, which is if the DIP is borrowed $50

3   million and there are $60 million of sale proceeds, there

4   would first be everyone's reserving the right to determine

5   the allocable value of the proceeds to Canada.  Once it's

6   determined to say that the allocable value of Canada, one-

7   third of the stock is $3 million, the banks would reserve the

8   right to be able to come in and have the Court deem that some

9   portion of that value be applied to repayment of the DIP, and

10  the Committee could come in and say, You know, that doesn't

11  make any sense, you should be paid from the previously

12  unencumbered assets and leave these proceeds available for

13  the Committee.

14          THE COURT: And what principle would I be employing

15  in order to determine what the answer should be?

16          MR. BASTA: It is a - I really believe it would come

17  back to what is reasonable terms for a DIP facility.  I think

18  we'd have to take the clock back to today and say, what makes

19  sense under the circumstances.  The issue here though, Your

20  Honor, is - it's probably just going to resolve itself out -

21          THE COURT: Well, that's -

22          MR. BASTA: I think through both the discussions on

23  a plan negotiation as well as the terms of the bids and so,

24  we've been struggling to try and get past today recognizing

25  that it may not be the cleanest solution.

1          THE COURT: I think that's a fair statement.  It's

2     not, but most things tend to resolve themselves over time for

3     one reason or another.  If not, we'll all be faced with, I

4     think, a little bit of a mushy situation, but I'm willing to

5     take that risk if the parties are.

6          MR. BASTA: I think we are, Your Honor.

7          THE COURT: Okay.  Anyone else care to be heard on

8     the financing motion?

9          MR. AUSTIN: Your Honor, it's Jess Austin on behalf

10    of the DIP lenders just to state that the resolution Mr.

11    Basta outlined is acceptable to my clients.

12         THE COURT: All right, thank you.

13         MS. LEVINE: Confirm for the Committee as well, Your

14    Honor.

15         THE COURT: Thank you.

16         MR. SASSOWER: Your Honor, I have proposed orders

17    for wages, Houlihan Lokey, Covington & Burling, Strom, and

18    the contract and lease motions.  The other orders need to be

19    settled and submitted with certifications of counsel.

20         THE COURT: All right.

21         MR. SASSOWER: May I approach?

22         THE COURT: Yes.

23         MR. SASSOWER: Thank you.

24         THE COURT: Thank you.  All right.  Let's just for

25    the record go down the agenda and just title it with what has

1   yet to come in under certification.

2           MR. SASSOWER: Okay.

3           THE COURT: Starting with number 15.

4           MR. SASSOWER: I believe you just signed 15, Your

5   Honor.

6           THE COURT: That's right.

7           MR. SASSOWER: Sixteen will be settled and submitted

8   to Your Honor's chambers.

9           THE COURT: All right.

10          MR. SASSOWER: Seventeen was just signed, I believe

11  -

12          THE COURT: Well -

13          MR. SASSOWER: No, I'm sorry, that's the protective

14  order.  Seventeen, we'll submit.

15          THE COURT: Okay.

16          MR. SASSOWER: Eighteen was just signed.

17          THE COURT: Yes.

18          MR. SASSOWER: Nineteen, we will submit.

19          THE COURT: All right.

20          MR. SASSOWER: Twenty, we'll submit.  Twenty-one, we

21  will submit, and 22 we will submit.

22          THE COURT: All right, thank you.  Anything further

23  for today?

24          MR. SASSOWER: No, thank you, Your Honor, for your

25  time as always.

1          THE COURT: You're welcome.  That concludes this

2    hearing.  Court will stand in recess.

3          (Whereupon at 3:09 p.m., the hearing in this matter

4    was concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan                        April 10, 2008
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221