# Exhibit A

**<u>EXECUTION COPY</u>**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**NBTY ACQUISITION, LLC**

**as Purchaser,**

**NBTY, INC.**

**as Buyer Holdco,**

**and**

**LEINER HEALTH PRODUCTS INC.,**

**LEINER HEALTH SERVICES CORP., AND**

**LEINER HEALTH PRODUCTS, LLC**

**as Sellers**

**Dated as of May 30, 2008**

## TABLE OF CONTENTS

ARTICLE I. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES.......... 1

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of Assets | 1 |
| 1.2 | Excluded Assets | 4 |
| 1.3 | Assumption of Liabilities | 6 |
| 1.4 | Excluded Liabilities | 7 |
| 1.5 | Cure Costs; Disclosure Schedule. | 9 |
| 1.6 | "As Is" Transaction | 9 |

ARTICLE II. CONSIDERATION.................................................................... 10

| | | |
|---|---|---|
| 2.1 | Consideration. | 10 |
| 2.2 | Purchase Price Deposit | 10 |
| 2.3 | Cash Purchase Price Adjustment. | 11 |
| 2.4 | Cure Cost Adjustment | 12 |
| 2.5 | Holdback Account. | 12 |

ARTICLE III. CLOSING AND TERMINATION ................................................ 12

| | | |
|---|---|---|
| 3.1 | Closing | 12 |
| 3.2 | Closing Deliveries by the Sellers | 13 |
| 3.3 | Closing Deliveries by the Purchaser | 14 |
| 3.4 | Termination of Agreement | 14 |
| 3.5 | Procedure Upon Termination | 16 |
| 3.6 | Effect of Termination; Break-up Fee and Expense Reimbursement | 16 |

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE SELLERS.................. 17

| | | |
|---|---|---|
| 4.1 | Corporate Organization and Qualification | 17 |
| 4.2 | Subsidiaries. | 17 |
| 4.3 | Authority | 18 |
| 4.4 | Consents of Third Parties; No Conflict | 18 |
| 4.5 | Absence of Certain Developments | 19 |
| 4.6 | Litigation | 20 |
| 4.7 | Intellectual Property | 20 |
| 4.8 | Contracts and Commitments | 21 |
| 4.9 | Material Licenses | 22 |
| 4.10 | Brokers and Finders | 22 |
| 4.11 | Title to Purchased Assets | 22 |
| 4.12 | Tangible Personal Property | 22 |
| 4.13 | Real Property | 23 |
| 4.14 | Employee Benefit Plans | 23 |
| 4.15 | Compliance with Law | 24 |
| 4.16 | Product Liability | 24 |
| 4.17 | Excluded Assets | 25 |
| 4.18 | Certain Entities. | 25 |

4.19    Genuineness and Authenticity of Minutes ........................................................ 25
4.20    Insurance .......................................................................................................... 25
4.21    Affiliate Transactions ........................................................................................ 25
4.22    Employees; Labor Relations .............................................................................. 25
4.23    Environmental Matters ...................................................................................... 26
4.24    Accounts Receivable .......................................................................................... 28
4.25    No Undisclosed Liabilities ................................................................................. 28
4.26    Taxes .................................................................................................................. 28
4.27    GST Registration ............................................................................................... 30
4.28    Financial Statements .......................................................................................... 30
4.29    Inventory ............................................................................................................ 30
4.30    Bank Accounts; Powers of Attorney .................................................................. 31
4.31    Post-Petition Designated Contracts ................................................................... 31
4.32    Entire Business; Assets of the Non-Seller Entities ............................................ 31

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 31

5.1    Corporate Organization and Qualification .......................................................... 32
5.2    Authority ............................................................................................................ 32
5.3    No Violation ....................................................................................................... 32
5.4    Brokers and Finders ........................................................................................... 33
5.5    Financial Capability ........................................................................................... 33
5.6    Adequate Assurances Regarding Assigned Contracts ........................................ 33
5.7    Investigation ...................................................................................................... 33
5.8    Expiration of Representations and Warranties ................................................... 33

ARTICLE VI. EMPLOYEES .......................................................................................... 34

6.1    Employees ........................................................................................................... 34
6.2    Employee Benefits .............................................................................................. 35

ARTICLE VII. BANKRUPTCY COURT MATTERS ..................................................... 35

7.1    Competing Bid .................................................................................................... 35
7.2    Sale Motion and Order ....................................................................................... 36
7.3    Order Approving Payment of Break-up Fee ....................................................... 37
7.4    Defense of Orders .............................................................................................. 38
7.5    Cooperation ........................................................................................................ 38

ARTICLE VIII. COVENANTS AND AGREEMENTS ..................................................... 38

8.1    Conduct of Business of the Sellers ..................................................................... 38
8.2    Access to Information ......................................................................................... 40
8.3    Assignability of Certain Contracts; Agreement with Respect to
         Post-Petition Designated Contracts, Etc. .......................................................... 41
8.4    Adequate Assurances Regarding Assigned Contracts ........................................ 41
8.5    Post-Closing Agreements .................................................................................... 41
8.6    Further Assurances ............................................................................................. 42

8.7     Preservation of Records ............................................................................... 44
8.8     Publicity ....................................................................................................... 44
8.9     Communication with Acquired Customers and Suppliers............................ 45
8.10    Regulatory Matters and Approvals .............................................................. 45
8.11    Discharge of Encumbrances With Respect to the Non-Seller Entities ......... 45
8.12    Tax Matters .................................................................................................. 45
8.13    Product Analysis .......................................................................................... 46
8.14    Purchased Assets at Fort Mill Location ....................................................... 46
8.15    Employee Records ........................................................................................ 46

ARTICLE IX. CONDITIONS TO CLOSING ............................................................. 46

9.1     Conditions Precedent to the Obligations of the Purchaser and the Sellers ......... 46
9.2     Conditions Precedent to the Obligations of the Sellers ............................... 47
9.3     Conditions Precedent to the Obligations of the Purchaser........................... 47
9.4     Frustration of Closing Conditions................................................................ 49

ARTICLE X. DEFINITIONS ...................................................................................... 49

10.1    Certain Definitions.  As used herein: ........................................................... 49

ARTICLE XI. TAXES.................................................................................................. 62

11.1    Transfer Taxes ............................................................................................. 62
11.2    Allocation of Purchase Price and Purchased Assets ..................................... 62

ARTICLE XII. MISCELLANEOUS............................................................................. 63

12.1    Payment of Expenses ................................................................................... 63
12.2    Survival of Representations and Warranties; Survival of Confidentiality........... 63
12.3    Casualty, Risk of Loss ................................................................................. 63
12.4    Entire Agreement; Amendments and Waivers .............................................. 64
12.5    Counterparts................................................................................................. 64
12.6    Governing Law ............................................................................................ 64
12.7    Jurisdiction, Waiver of Jury Trial ................................................................ 64
12.8    Notices ........................................................................................................ 65
12.9    Binding Effect; Assignment; Guaranty......................................................... 66
12.10   Severability.................................................................................................. 67
12.11   Injunctive Relief........................................................................................... 67
12.12   Non-Recourse .............................................................................................. 67
12.13   Certain Interpretations. ................................................................................ 67

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Quitclaim Deed |
| Exhibit D | Form of Sale Order |
| Exhibit E | Form of Deposit Escrow Agreement |
| Exhibit F | Form of Holdback Escrow Agreement |
| Exhibit G-1 | Form of Trademark Assignment |
| Exhibit G-2 | Form of Trademark Assignment |
| Exhibit H | Form of Copyright Assignment |
| Exhibit I-1 | Form of Assignment of Patents |
| Exhibit I-2 | Form of Assignment of Patents |

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Acquired Customers |
| Schedule 2 | Customer Contracts |
| Schedule 3 | Vendor Contracts |
| Schedule 4 | Assumed Real Property Leases |
| Schedule 5 | Assumed Owned Real Property |
| Schedule 6 | Equipment |
| Schedule 7 | Post-Petition Designated Contracts |
| Schedule 8 | Health and Welfare Plan Contracts |
| Schedule 9 | Non-Assumed Contracts |
| Schedule 10 | Cure Costs |
| Schedule 11 | Permitted Encumbrances |
| Schedule 12 | US Trial Balance Accounts Schedule |
| Schedule 13 | March 31, 2008 Working Capital Calculation |

v

## DISCLOSURE SCHEDULES

| Section 2.3 | Working Capital |
| Section 4.1 | Corporate Organization and Qualification |
| Section 4.2 | Subsidiaries |
| Section 4.3 | Authority |
| Section 4.4 | Consents of Third Parties |
| Section 4.5 | Absence of Certain Developments |
| Section 4.6 | Litigation |
| Section 4.7 | Intellectual Property |
| Section 4.8 | Contracts and Commitments |
| Section 4.9 | Material Licenses |
| Section 4.10 | Brokers and Finders |
| Section 4.11 | Title to Purchased Assets |
| Section 4.12 | Tangible Personal Property |
| Section 4.13 | Real Property |
| Section 4.14 | Employee Benefit Plans |
| Section 4.15 | Compliance with Law |
| Section 4.16 | Product Liability |
| Section 4.18 | Certain Entities |
| Section 4.20 | Insurance |
| Section 4.22 | Employees; Labor Relations |
| Section 4.23 | Environmental Matters |
| Section 4.24 | Accounts Receivable |
| Section 4.25 | Undisclosed Liabilities |
| Section 4.26 | Taxes |
| Section 4.27 | GST Registration |
| Section 4.29 | Inventory |
| Section 4.30 | Banks Accounts; Powers of Attorney |

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of May 30, 2008 (the "Execution Date"), by and among Leiner Health Products Inc., a Delaware corporation ("Parent"), Leiner Health Services Corp., a Delaware corporation ("Leiner Services"), Leiner Health Products, LLC, a Delaware limited liability company ("Leiner Products" and together with Parent and Leiner Services, each a "Seller" and collectively the "Sellers"), NBTY Acquisition, LLC, a Delaware limited liability company and its Permitted Assigns (as defined in Section 12.9) (the "Purchaser") and NBTY, Inc., a Delaware corporation, which wholly owns the Purchaser ("Buyer Holdco"). Certain capitalized terms used herein are defined in Article X.

## RECITALS

WHEREAS, the Sellers and the Non-Seller Entities currently conduct the Business (as defined herein) and the Purchaser desires to purchase all of the assets of the Sellers other than the Excluded Assets (as defined herein);

WHEREAS, each Seller is a debtor and debtor-in-possession in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") filed on March 10, 2008 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case Nos. 08-10446, 08-10447, 08-10448 and 08-10449 (as Jointly Administered, collectively, the "Chapter 11 Cases");

WHEREAS, the Sellers have filed a motion seeking approval of, among other things, certain bidding procedures and the scheduling of a sale by auction of certain of the assets and liabilities of the Sellers primarily used in the Business, which approval was granted in an order dated April 10, 2008 (the "Bidding Procedures Order");

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein and following the entry of a Sale Order (as defined herein) acknowledging the Purchaser as the prevailing bidder and subject to the terms and conditions thereof, the Sellers shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from the Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and assume from the Sellers the Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, the Purchaser and the Sellers hereby agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1 Purchase and Sale of Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall purchase, acquire and accept from each Seller and each Seller

shall sell, transfer, assign, convey and deliver to the Purchaser on the Closing Date all of such Seller's right, title and interest in, to and under the Purchased Assets, which are intended to constitute all assets, properties and rights of the Sellers used, usable or held for use to operate the Business (it being acknowledged and agreed that the purchase of the issued and outstanding capital stock and other equity interests of the Non-Seller Entities shall vest indirectly in the Purchaser all assets of the Non-Seller Entities), in each case free and clear of all Encumbrances except for Permitted Encumbrances (it being acknowledged and agreed that the only representations and warranties made by the Sellers (or made with respect to the Business) shall be those representations and warranties expressly set forth in Article IV (which are subject to the limitations and restrictions contained in this Agreement)). The "Purchased Assets" shall mean, collectively, all of Sellers' rights, title and interest in all of the assets of the Sellers of every kind or character and description, whether tangible, real, personal, or mixed, and wheresoever located, other than the Excluded Assets, including, without limitation, the following:

(a) Seller Contracts with those customers set forth on <u>Schedule 1</u> (the "<u>Acquired Customers</u>") (collectively, the "<u>Customer Contracts</u>"), the current listing of which is generally set forth on <u>Schedule 2</u>; provided, however, that the final listing of Acquired Customers and Customer Contracts shall be set forth in an appropriate instrument of conveyance mutually acceptable to the Purchaser and the Sellers and delivered to the Purchaser at the Closing;

(b) Accounts Receivable (it being acknowledged and agreed that the purchase of the issued and outstanding capital stock and other equity interests of the Non-Seller Entities) shall vest indirectly in the Purchaser all of the Accounts Receivable of the Non-Seller Entities) (the "<u>Acquired Accounts Receivable</u>"), together with all intercompany receivables or notes payable from any Non-Seller Entity to any Seller;

(c) Seller Contracts with suppliers and vendors listed on <u>Schedule 3</u> (the "<u>Vendor Contracts</u>");

(d) Sellers' right, title and interest in and to those leases for the Leased Real Property listed on <u>Schedule 4</u>;

(e) deposits and prepaid expenses, including, without limitation, (x) security deposits with third-party suppliers, vendors or service providers, to the extent such deposit or prepaid expense arose from an Assigned Contract, and (y) all deposits with utility companies or similar Persons that have been made by any Seller;

(f) Documents relating to the Business, Acquired Customers, Products, Services, marketing, advertising, promotional activities, trade shows, and all files, supplier lists, records, literature and correspondence, in each case in the possession of the Sellers as of the date of this Agreement (it being understood that the Sellers may keep copies of any documents they believe may be reasonably necessary or desirable solely to administer the bankruptcy estates and accomplish the orderly wind-down of the Sellers);

(g) Owned Intellectual Property;

(h) Licensed Intellectual Property, including under all IP License Contracts;

2

(i) The names "LHP," "Leiner," "Leiner Health," "Leiner Health Products," "Leiner Health Services," "Vita," "Vita Health Products," "VH Vita Holdings," and any derivations thereof together with all of Seller's rights to the websites used in the Business anywhere in the world;

(j) insurable, fee simple title to the Owned Real Property (including all buildings and other improvements thereon and all appurtenances thereto) listed on Schedule 5, free and clear of all Encumbrances but subject to any applicable Permitted Encumbrances;

(k) all Equipment, vehicles, office supplies, furniture, fixtures and other tangible personal property of every kind and description in the possession of the Sellers as of the date of this Agreement, including, without limitation, those items listed on Schedule 6;

(l) solely to the extent transfer is permitted under the Bankruptcy Code or other applicable Law, Licenses necessary for the lawful ownership of the Purchased Assets or other lawful conduct of the Business as currently conducted;

(m) the Sellers' rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees, agents or third parties, including, without limitation, the Acquired Customers, but excluding any employment agreements containing any such agreements;

(n) the Sellers' rights, claims, credits, causes of action or rights of setoff against third parties under vendors' or manufacturers' warranties, indemnities and guaranties;

(o) all of the issued and outstanding capital stock of and other equity ownership interests in the Non-Seller Entities (as defined in Article X), together with all Documents of the type described in Section 1.2(f) that relate to a Non-Seller Entity;

(p) all claims, demands, proceedings and causes of action asserted by such Seller under all insurance policies relating directly to any Purchased Asset and arising during the period prior to the Closing;

(q) all claims, choses in action, causes of action and judgments relating to the Business or the Purchased Assets, excluding any of the same identified in Section 1.2(h);

(r) all Sellers' right, title and interest in and to the those Contracts entered into by a Seller on or after the Petition Date listed on Schedule 7 (the "Post-Petition Designated Contracts");

(s) all Seller's rights, title and interest in and to the Personal Property Leases (as defined in Section 4.12);

(t) all rights, title and interest in and to those Contracts with respect to Seller's provision of those health and welfare benefit plans listed on Schedule 8 (the "Health and Welfare Plan Contracts");

(u) (1) those Seller Contracts that are not Non-Assumed Contracts and (2) the Post-Petition Designated Contracts (the "Assigned Contracts"); and

(v) the Sellers' rights, title and interest in and to any payments made by customers of the Sellers on or before the Closing to the extent that such payments are not received and evidenced by cleared funds in the Sellers' Bank Accounts and Lock Boxes and Safe Deposit Boxes (as such terms are defined in Section 4.32 below) prior to Closing;

(w) the personnel files for all Employees who become employees of the Purchaser, it being understood and agreed that the Purchaser shall indemnify and hold harmless Sellers from any use by the Purchaser of such personnel files that is in violation of applicable Law;

(x) Inventory of the Sellers related to the VMS Business;

(y) subject to Section 1.2(j), all Bank Accounts and Lock Boxes and Safe Deposit Boxes; and

(z) goodwill to the extent attributable to the Purchased Assets.

As of the Closing, (i) all of the Sellers' right, title and interest in and to the Purchased Assets shall be immediately vested in the Purchaser free and clear of any and all Encumbrances, except for Permitted Encumbrances, all in accordance with the Sale Order, and (ii) all risk of loss as to all Purchased Assets shall pass from the Sellers to the Purchaser.

1.2 Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey, and each Seller shall retain all right, title and interest to, in and under, the following assets, properties, interests and rights of each Seller (collectively, the "Excluded Assets"):

(a) any Contract which cannot be assumed and assigned pursuant to the terms of Bankruptcy Code Section 365, by virtue of its being non-executory in nature or a Rejected Contract or non-assignable under the terms of such Bankruptcy Code Section;

(b) rights and claims under all Contracts that are not Assigned Contracts, and all employment agreements and severance agreements with any Employees;

(c) Documents (whether copies or originals) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of Seller or of any controlling affiliate of Seller, (ii) the disclosure of which would (X) violate any legal constraints or obligations regarding the confidentiality thereof, waive any attorney client, work product or similar privilege, (Y) that a Seller is required by Law to retain or (Z) disclose information about Seller or any of its present or past Affiliates which is not directly related to the Business, or (iii) prepared primarily in connection with to the transactions contemplated by this Agreement, including bids received from other parties;

(d) capital stock and limited liability company interests in Leiner Services, Leiner Products and LHP;

4

(e)    except as provided in Section 1.1(p), all insurance policies of the Sellers, or any of them, (including director and officer insurance policies) or rights to proceeds thereof relating to the assets, properties or operations of such Seller (regardless of whether arising before or after the Closing Date);

(f)    except as provided in Section 1.1(o), Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws, Tax Returns of Sellers and related work papers, letters from accountants and other documents relating to the organization and existence of such Seller as a corporation or other legal entity, as applicable (together with analogous documentation of the Sellers);

(g)    Except as may be specifically subject to an Assigned Contract, all of such Seller's right, title and interest in and under the Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans;

(h)    claims, credits, causes of action, rights of recovery, rights of recoupment and rights of setoff of any kind or nature such Seller may have that (i) are not against Non-Seller Entities, (ii) do not relate to Purchased Assets, (iii) relate to transactions occurring in connection with the Business on or prior to the Closing Date, other than with respect to Accounts Receivable (it being acknowledged and agreed that the purchase of the issued and outstanding capital stock and other equity interests of the Non-Seller Entities shall vest indirectly in the Purchaser all of the Accounts Receivable of the Non-Seller Entities), (iv) arise under Chapter 5 of the Bankruptcy Code, including, without limitation, any avoidance actions, (v) relate to the Sellers' capitalization or debt financing, and (vi) are against any directors, officers and/or employees of the Sellers relating to actions or failures to act at any time on or prior to the Closing Date, but excluding claims, credits, causes of action or rights of setoff described in Section 1.1(n) and (p) of this Agreement;

(i)    the Sellers' right, title and interest in and to the Non-Assumed Contracts, including, for the avoidance of doubt, those Contracts and arrangements of any of the Sellers which are not Assigned Contracts and those Contracts of any of the Sellers to the extent they involve customers who are not Acquired Customers;

(j)    all cash and Cash Equivalents, other than cash in transit and items covered by Sections 1.1(e) and (v), regardless of whether on hand or in banks or other financial institutions, all security entitlements, securities accounts, commodity contracts and commodity accounts, all cash retainers held by any professional retained by the Bankruptcy Court and all cash tendered as part of the Purchase Price;

(k)    personnel files for Employees not becoming employees of the Purchaser;

(l)    Seller's rights, title and interest in and to those Contracts entered into by a Seller on or after the Petition Date other than the Post-Petition Designated Contracts;

(m) all Tax assets of the Sellers including deferred Tax assets and income Tax receivables; and

(n) each Seller's (and Non-Seller Entity's) rights under this Agreement.

1.3 <u>Assumption of Liabilities</u>.  Upon the transfer of the Purchased Assets on the Closing Date in accordance with the terms hereof, the Purchaser shall assume only the following Liabilities and no other Liabilities of the Sellers (it being understood that the Purchaser shall acquire the stock or other equity interests of the Non-Seller Entities with the result that the Liabilities of the Non-Seller Entities immediately after the Closing will be the same as the Liabilities of the Non-Seller Entities immediately prior to the Closing) (collectively, the "Assumed Liabilities"):

(a) Liabilities of any Seller under each Assigned Contract or owed by any Seller to any Acquired Customer arising from and after the Closing Date, and all Cure Costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of each Assigned Contract;

(b) all Liabilities of the Sellers for customer allowances relating to Acquired Customers, regardless of whether arising before, on or after the Petition Date to the extent such Liabilities are either accrued on balance sheets included in the Financial Statements or are current liabilities determined in accordance with GAAP;

(c) Liabilities of the Sellers under or relating to Licenses (of any Seller or any Non-Seller Entity) arising from and after the Closing Date to the extent they are actually assigned to the Purchaser under <u>Section 1.1(l)</u> above;

(d) Liabilities of the Sellers relating to or arising from the ownership or operation of the Business or from the Purchased Assets after the Closing Date;

(e) Liabilities of the Sellers consisting of accounts payable incurred in the Ordinary Course of Business with respect to the Business (other than those related to the OTC Business conducted by the Sellers in the United States of America) first arising on or after the Petition Date.  For the avoidance of doubt, Liabilities of the Sellers under Section 503(b)(9) of the Bankruptcy Code shall not be considered as arising on or after the Petition Date;

(f) Liabilities arising before, on or after the Petition Date which are owing on behalf of those Employees of the Sellers who have become employees of the Purchaser as of the Closing pursuant to <u>Section 6.1</u> with respect to accrued vacation, accrued personal days, accrued sick leave, accrued payroll deductions, accrued employer payroll tax, payroll accrual, in-house commissions and health insurance accrual;

(g) Liabilities of Sellers arising pursuant to Post-Petition Designated Contracts; and

(h) without duplication, Liabilities arising before, on or after the Petition Date to the extent such Liabilities are of a type included within the categories of liabilities identified with a "Y" on the <u>US Trial Balance Accounts Schedule</u> attached hereto on <u>Schedule 12</u>, provided that

6

nothing in this clause (h) shall obligate the Purchaser to assume any contractual or other obligation arising after the Closing Date.

1.4 <u>Excluded Liabilities</u>. The Parties acknowledge that the Assumed Liabilities shall include only those Liabilities set forth in Section 1.3 hereof. The Purchaser shall not assume, and shall not be deemed to have assumed, any Liabilities of the Sellers (other than the Assumed Liabilities), including, without limitation, those Liabilities set forth below (collectively, the "Excluded Liabilities") (it being understood that the Purchaser shall acquire the stock or other equity interests of the Non-Seller Entities with the result that the Liabilities of the Non-Seller Entities immediately after the Closing will be the same as the Liabilities of the Non-Seller Entities immediately prior to the Closing):

(a) all Liabilities of the Sellers to the extent arising out of or otherwise relating to the Excluded Assets;

(b) all Liabilities for Taxes of the Sellers relating to periods prior to the Closing;

(c) all Liabilities of each Seller to the extent arising from its breach of any term, covenant or provision of any Assigned Contract arising before the Closing (except for Liabilities assumed pursuant to <u>Section 1.3(a)</u> of this Agreement);

(d) all Liabilities of the Sellers in respect of Contracts that are not Assigned Contracts, including, without limitation, Liabilities of the Sellers in respect of Contracts entered into on or after the Petition Date other that Post-Petition Designated Contracts;

(e) all Liabilities of each Seller in respect of Indebtedness incurred prior to the Closing, whether or not relating to the Business, other than capital leases that are Assigned Contracts;

(f) all Liabilities to the extent arising from or relating to the employment, or termination of employment by the Sellers, of any Employee, former Employee, independent contractor or contingent worker with respect to the Business prior to the Closing Date except for Liabilities assumed pursuant to <u>Section 1.3(f)</u>;

(g) except (i) as may be specifically subject to an Assigned Contract or (ii) as provided under <u>Section 6.2(b)</u>, all Liabilities to the extent arising under or otherwise in respect of any Seller Plan;

(h) any and all trade and vendor accounts payable, including, without limitation, trade and vendor accounts payable to the extent related to the Business and outstanding on or before the Closing and related to products and services provided to the Sellers on or before the Closing, other than as specifically assumed by the Purchaser under <u>Section 1.3</u> of this Agreement;

(i) all Liabilities to the extent relating to amounts expressly required to be paid by the Sellers hereunder;

7

(j) Liabilities, if any, that arise from, relate to, or result from the current, ongoing investigation of the Sellers and their Affiliates by the United States Department of Justice and the United States Food and Drug Administration;

(k) all Liabilities of any Seller arising out of pending or threatened legal proceedings relating to periods prior to the Closing;

(l) all Liabilities of any Seller relating to the manufacturing or sale of products prior to the Closing, other than Liabilities specifically assumed pursuant to Sections 1.3(e), (f) or (h);

(m) Liabilities of the Sellers, if any, that arise from, relate to or result from the Management Incentive Plans;

(n) all Liabilities of the Sellers relating to termination of Employees of the OTC Business arising during the period prior to the Closing;

(o) all Liabilities for professional fees of the Sellers and fees owed to the U.S. Trustee;

(p) all Liabilities of the Sellers with respect to any matter set forth (i) in Section 4.5 of the Disclosure Schedule as item numbers 2, 3, 5, 7, 8, 9, 2nd sentence of item number 11, 14, 15, 16, 17, 18, 19 and 20; (ii) in Section 4.6 of the Disclosure Schedule; (iii) the unreleased liens on most of the United States trademarks described in FN2 of Section 4.7 of the Disclosure Schedule and the potential IP Litigation disclosed in Section 4.7 of the Disclosure Schedule; (iv) the South Carolina equipment leases identified in Section 4.12 of the Disclosure Schedule; (v) items 3, 5 and 6-18 of Section 4.14 of the Disclosure Schedule; (vi) item 1 under Section 4.15 of the Disclosure Schedule; (vii) all items included in Section 4.16 of the Disclosure Schedule; (viii) all items listed on Section 4.20 of the Disclosure Schedule; (ix) items described in Section 4.22 of the Disclosure Schedule under the heading "Current Annual Bonus Potential" for all employees other than Employees of the Non-Seller Entities; (x) the Sarbanes Oxley litigation referred to at Note 1 of Section 4.22 of the Disclosure Schedule; (xi) all items of Section 4.23 of the Disclosure Schedule; (xii) item 1 in Section 4.25 of the Disclosure Schedule, or (xii) all items described in the last paragraph of Section 4.26 of the Disclosure Schedule;

(q) all Liabilities of the Sellers with respect to any non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees, agents or third parties, including, without limitation, the Acquired Customers;

(r) all Liabilities of the Sellers with respect to any Contract, License, or other arrangement or any other matter to the extent not set forth in the Disclosure Schedules to this Agreement (taking into account the updates or modifications, if any, permitted by this Agreement to be made to the Disclosure Schedules);

(s) all Liabilities under or with respect to LHP Holding Corp. 2004 Stock Option and all stock option agreements entered unto thereunder; and

8

(t) all other Liabilities of the Sellers to the extent not expressly assumed by the Purchaser pursuant to Section 1.3.

1.5 Cure Costs; Disclosure Schedule.

(a) The Purchaser shall pay and discharge and be responsible only for those Cure Costs set forth on Schedule 10 and the Sellers shall have no Liability therefor or otherwise in connection therewith. The Cure Cost for any Assigned Contract not listed on Schedule 10 and for any Assigned Contract listed on Schedule 10 for which no Cure Cost is specified on Schedule 10 shall be deemed to be $0.

(b) From time to time prior to the Closing, the Sellers may supplement or amend (i) the Cure Costs set forth on Schedule 10 to bring them up to date; provided, however, if any Cure Cost is greater than 110% of the Cure Cost set forth on Schedule 10 as in effect on the Execution Date, the Purchaser shall have the right to designate the associated contract as a Non-Assumed Contract, (ii) the Disclosure Schedules to this Agreement with respect to any matter that, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules (it being understood and agreed that the Disclosure Schedules shall be deemed amended by all such supplements and amendments for all purposes hereunder), and (iii) Schedule 1, Schedule 2, Schedule 3, Schedule 4, Schedule 7, Schedule 8 and Schedule 9, it being understood and agreed hereby that (a) notwithstanding anything contained in this Agreement to the contrary, the Sellers shall have the unconditional right to terminate or reject in the Bankruptcy Court any Non-Assumed Contracts and (b) any amendment or supplement pursuant to the preceding clauses (i) and (ii) shall not modify the rights of the Purchaser pursuant to Section 3.4(c) after giving effect to such amendment or supplement.

1.6 "As Is" Transaction. THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV OF THIS AGREEMENT, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF OWNED REAL PROPERTY OR ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR CONTRACT TO BE ASSUMED BY THE PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHETHER OWNED IN FEE OR THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY THE PURCHASER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PROPERTY (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF) THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE

9

PURCHASED ASSETS OR ANY PORTION THEREOF.   WITHOUT IN ANY WAY
LIMITING THE FOREGOING, THE SELLERS HEREBY DISCLAIM ANY WARRANTY,
EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR
PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.   THE PURCHASER
FURTHER ACKNOWLEDGES THAT THE PURCHASER HAS CONDUCTED AN
INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION
OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR
AFFECTING THE PURCHASED ASSETS AS THE PURCHASER DEEMED NECESSARY
OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE
PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES
EXPRESSLY SET FORTH IN ARTICLE IV HEREOF, THE PURCHASER IS DOING SO
BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.
ACCORDINGLY, THE PURCHASER WILL ACCEPT THE PROPERTY AT THE CLOSING
"AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE II.

## CONSIDERATION

2.1 Consideration.

(a) The aggregate consideration to be paid for the purchase of the Purchased
Assets shall be cash in the amount of TWO HUNDRED THIRTY MILLION DOLLARS
($230,000,000) subject to adjustment as provided in Sections 2.3, 2.4 and 2.5 hereof (the "Cash
Purchase Price").

(b) In addition to the foregoing payment, as consideration for the grant, sale,
assignment, transfer and delivery of the Purchased Assets, the Purchaser shall assume and
discharge the Assumed Liabilities, including, without limitation, the Cure Costs, in accordance
with Section 1.3 (the Cash Purchase Price, plus the Assumed Liabilities, collectively, the
"Purchase Price").

2.2 Purchase Price Deposit.   Simultaneously herewith, the Purchaser shall deposit with
JPMorgan Chase Bank, National Association (the "Escrow Agent"), pursuant to the terms of the
Deposit Escrow Agreement, by certified check or wire transfer of immediately available funds,
the aggregate sum of ELEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS
($11,500,000) (the "Deposit Amount"). Pursuant to the Deposit Escrow Agreement:

(a) At Closing, the Deposit Amount plus all accrued interest and investment
income thereon shall be (i) applied towards the Purchase Price payable by the Purchaser to the
Sellers under Section 3.3(a) hereof; and (ii) delivered to the Sellers at Closing;

(b) If this Agreement is terminated by the Sellers pursuant to Section 3.4(d)(ii),
the Deposit Amount plus all accrued interest and investment income thereon shall be delivered to
the Sellers (it being understood that receipt of the Deposit Amount shall not constitute the sole
and exclusive remedy of the Sellers with respect to the matters and circumstances relating thereto

and the Sellers shall continue to have available to them all other rights and remedies available at law and/or equity with respect thereto); and

(c) If this Agreement is terminated other than pursuant to <u>Section 3.4(d)(ii)</u>, the Deposit Amount, together with all accrued interest and investment income thereon, shall be returned to the Purchaser.

2.3 <u>Cash Purchase Price Adjustment.</u>

(a) In the event that Working Capital on the Closing Date is (i) less than $116,500,000, then the Cash Purchase Price shall be adjusted downward on a dollar for dollar basis by the amount of such shortfall or (ii) greater than $126,500,000, then the Cash Purchase Price shall be adjusted upward, on a dollar for dollar basis by the amount of such excess. For purposes hereof, "<u>Working Capital</u>" shall mean, at any given time (i) the sum of the current assets included in the Purchased Assets at such time <u>plus</u> the current assets of the Non-Seller Entities (including cash or Cash Equivalents) at such time <u>minus</u> (ii) the sum of the current liabilities included in the Assumed Liabilities at such time <u>plus</u> the current liabilities of the Non-Seller Entities at such time, all determined in accordance with GAAP, consistently applied, <u>minus</u> (iii) to the extent not otherwise included in current liabilities (and without duplication), the accrued and unpaid expenses related to employees of the Sellers and of the Non-Seller Entities to the extent that such expenses are Assumed Liabilities, all as calculated in accordance with, and on a basis consistent with, the US Trial Balance Accounts Schedule attached hereto on <u>Schedule 12</u> and the <u>March 31, 2008 Working Capital Calculation</u> attached hereto on <u>Schedule 13</u>.

(b) Not later than 45 days following the Closing Date, the Purchaser shall prepare and deliver to the Sellers a final statement (the "<u>Final Statement</u>") setting forth as of the Closing the actual Working Capital specifying in reasonable detail the method of calculation of the amounts set forth therein together with a calculation of any adjustment required to be made to the Cash Purchase Price in accordance with <u>Section 2.3(a)</u> (the "<u>Reconciliation Amount</u>"). The Purchaser shall deliver to the Sellers at the time of delivery of the Final Statement to the Sellers, a copy of the work papers used in preparation thereof. Subject to <u>Section 2.3(c)</u> below, within fifteen (15) days following the delivery of the Final Statement and such work papers to the Sellers, the Purchaser shall pay to the Sellers or the Sellers shall pay to the Purchaser, as applicable, the Reconciliation Amount, if any.

(c) In the event the Sellers object to any amounts shown on the Final Statement, the Sellers shall notify the Purchaser in writing of such objection within the fifteen (15) day period following the delivery thereof, stating in such written objection the reason therefor and setting forth in reasonable detail the calculation of the Reconciliation Amount. Upon receipt by the Purchaser of such written objection, the parties shall attempt to resolve the disagreement concerning the Reconciliation Amount through negotiation. If the Purchaser and the Sellers cannot resolve such disagreement concerning the Reconciliation Amount within twenty (20) days following the end of the foregoing fifteen (15) day period, the parties shall submit the matter for resolution to a firm of independent certified public accountants jointly selected by the Sellers and the Purchaser and not affiliated with either party, with the costs thereof to be shared equally by the parties. Such accounting firm shall deliver a statement setting forth its own calculation of the Reconciliation Amount if any within thirty (30) days of the submission of the matter to such firm

11

(which calculation, absent manifest error, shall be binding and conclusive on the parties and not subject to appeal). The Purchaser shall pay to the Sellers or the Sellers shall pay to the Purchaser, as applicable, the Reconciliation Amount shown to be due on the statement of such accounting firm promptly, but in no event later than five (5) days following the delivery of such statement by such accounting firm to the parties.

2.4 Cure Cost Adjustment. The Cash Purchase Price shall also be adjusted downward or upward on a dollar for dollar basis by the difference between the aggregate amount of the Cure Costs actually required to be paid by the Purchaser for Assigned Contracts (the "Final Cure Costs") as fixed by Order of the Bankruptcy Court or by the consent of the Sellers, the Purchaser and the Counterparty to the applicable Assigned Contract and $555,000. If the aggregate amount of the Final Cure Costs exceeds $555,000, then the Cash Purchase Price shall be decreased dollar for dollar by such difference. If the aggregate amount of the Final Cure Costs is less than $555,000, then the Cash Purchase Price shall be increased dollar for dollar by such difference.

2.5 Holdback Account.

At the Closing the Purchaser shall deduct the Holdback Amount from the amount otherwise payable pursuant to Section 2.1(a) and place it in an escrow account (the "Holdback Account") pursuant to the Holdback Escrow Agreement. In addition, the Purchaser and Buyer Holdco shall deliver to the Holdback Account the Security Amount to be held in escrow (pursuant to the Holdback Escrow Agreement) in respect of Purchaser's obligations to make payment pursuant to Section 2.3 or 2.4. Any amounts due and payable by Sellers to Purchaser pursuant to Section 2.3 or 2.4 shall be paid from amounts in the Holdback Account designated as the Holdback Amount; provided that if the amounts due and payable by the Sellers to the Purchaser pursuant to Section 2.3 or 2.4 (collectively, the "Seller Liability") exceed the amount in the Holdback Account, the Sellers shall have no further Seller Liability. Any amounts due and payable from Purchaser to the Sellers pursuant to Section 2.3 or 2.4 (the "Purchaser Liability") shall be paid first from amounts held in the Holdback Account and designated as the Security Amount. On the later of the date 120 days after the Closing and the date on which all amounts owing pursuant to Section 2.3 and 2.4 have been finally determined, the Holdback Account shall be closed and any balance remaining in the Holdback Account shall be automatically remitted (i) to the Sellers to the extent such amounts are designated as the Holdback Amount or (ii) to the Purchaser to the extent such amounts are designated as the Security Amount.

## ARTICLE III.

## CLOSING AND TERMINATION

3.1 Closing. Subject to the satisfaction of the conditions set forth in Sections 9.1 through 9.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets, and the assumption of the Assumed Liabilities provided for in Article I hereof (the "Closing") shall take place at the offices of Kirkland & Ellis LLP, located at Citigroup Center, 153 East 53rd Street, New York, New York 10022-4611 (or at such other place as the parties may designate in writing) on the date that is no later than thirty

(30) days following the entry of a Sale Order (which Sale Order has not been stayed or otherwise enjoined); provided that, to the extent the conditions set forth in Article IX are not satisfied by such date subject to Section 3.4, the period of time within which the Closing shall occur shall be automatically extended until, and the Closing shall occur promptly following, such date as all of the conditions set forth in Article IX hereof shall have been satisfied or waived (other than such conditions that by their nature are to be satisfied at the Closing), unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of each of the Sellers in the Purchased Assets to be acquired by the Purchaser hereunder shall be considered to have passed to the Purchaser as of 12:01 a.m. New York time on the Closing Date.

3.2 <u>Closing Deliveries by the Sellers</u>. At the Closing, the Sellers shall deliver to the Purchaser:

(a) a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as <u>Exhibit A</u>;

(b) a duly executed assignment and assumption agreement with respect to the Assumed Liabilities, substantially in the form attached hereto as <u>Exhibit B</u>;

(c) a duly executed and acknowledged quitclaim deed in recordable form with respect to the Owned Real Property, substantially in the form attached hereto as <u>Exhibit C</u>;

(d) a copy of the final Sale Order certified by the clerk of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit D</u>;

(e) a duly executed Holdback Escrow Agreement in the form attached hereto as <u>Exhibit F</u> (the "<u>Holdback Escrow Agreement</u>")

(f) a duly executed non-foreign person affidavit of each of the Sellers dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(g) a duly executed title affidavit and gap indemnity in a form reasonably acceptable to Seller and reasonably required by the title company issuing the Purchaser's title insurance policy for the Owned Real Property;

(h) the officer's certificates required to be delivered pursuant to <u>Sections 9.3(a)</u> and <u>9.3(b)</u>;

(i) letters in form and substance reasonably satisfactory to the Purchaser and Sellers issued by Endeavour EHS LLC (or their successor) authorizing the Purchaser to rely on the reports issued by Endeavour EHS LLC to the Sellers in the forms previously delivered to the Purchaser as if the Purchaser had originally engaged such consultants;

13

(j) share certificates or other documents evidencing ownership of each of the Non-Seller Entities, together with all original Books and Records related to the Non-Seller Entities;

(k) such other transfer, recordation and deed intake forms and other statements, disclosures, documents and certifications reasonably and customarily required to convey real property in the jurisdiction in which the Owned Real Property is located;

(l) either (i) a valid tax compliance certificate issued pursuant to Section 116 of the ITA in an amount not less than the Purchase Price with respect to its disposition of the shares of the Non-Seller Entities or (ii) a consent and valid power of attorney authorizing the Purchaser to make all necessary filings pursuant to Section 116 of the ITA;

(m) duly executed Trademark Assignments in substantially the forms attached hereto as Exhibits G-1 and G-2;

(n) a duly executed Copyright Assignment in substantially the form attached hereto as Exhibit H;

(o) duly executed Assignments of Patents in substantially the forms attached hereto as Exhibit I-1 and I-2; and

(p) such other conveyance documents, instruments and certificates as the Purchaser may reasonably request.

3.3 Closing Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver to (or at the direction of) the Sellers:

(a) by wire transfer of immediately available funds, the Cash Purchase Price (less the Holdback Amount);

(b) evidence of the deposit of the Holdback Amount with the Escrow Agent;

(c) a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B, and such other documentation as the Sellers may reasonably request evidencing the Purchaser's assumption of the Assumed Liabilities;

(d) a duly executed Holdback Escrow Agreement; and

(e) the officer's certificates required to be delivered pursuant to Sections 9.2(a) and 9.2(b).

3.4 Termination of Agreement. This Agreement may be terminated as follows:

(a) by the mutual written consent of the Sellers and the Purchaser at any time prior to the Closing;

(b) by the Purchaser or the Sellers, if:

14

(i)    there shall be in effect a Final and Non-Appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence); or

(ii)    the Bankruptcy Court shall enter, after the Auction, an Order approving a bid to purchase all or some of the Purchased Assets from a third party other than the Purchaser, and the transactions contemplated by such offer shall have been closed, consummated and funded, provided, however, that Sellers' sale of Inventory in the Ordinary Course of Business shall not trigger Sellers' obligation to pay the Break-up Fee or Expense Reimbursement Amount; or

(iii)    the Closing shall not have occurred on or before the date that is 120 days after the Execution Date (the "Outside Date");

(c)  by the Purchaser, if:

(i)    the auction of the Purchased Assets and Assumed Liabilities (the "Auction") shall not have commenced by the close of business on July 14, 2008;

(ii)    the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on July 18, 2008;

(iii)    the Closing shall not have occurred by the later of (x) the date that is thirty (30) days following the date that the Sale Order is entered by the Bankruptcy Court and (y) the tenth Business Day following satisfaction of all the conditions set forth in Article IX (as may be extended by the parties in writing, the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by the Purchaser, then the Purchaser may not terminate this Agreement pursuant to this Section 3.4(c)(iii);

(iv)    any condition precedent to the obligations of the Purchaser set forth in Sections 9.1 and 9.3 shall have become incapable of fulfillment other than as a result of a breach by the Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by the Purchaser;

(v)    there shall be a material breach by any of the Sellers of any representation or warranty of or on behalf of the Sellers, or any covenant or agreement of or on behalf of the Sellers contained in this Agreement which would result in a failure of a condition set forth in Sections 9.1 or 9.3 and which breach cannot be cured or has not been cured by the earlier of (i) twenty (20) Business Days after the giving of written notice by the Purchaser to the Sellers of such breach and (ii) the applicable Termination Date;

(vi)    the Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner is appointed in the Chapter 11 Cases; or

15

(vii)    the notice of the Hearing (as defined in the Interim Order Authorizing the Selling Debtors to Designate a Stalking Horse Bidder and to enter into the Break-up Fee Arrangement under certain circumstances (Docket No. 299)), conforming with the requirements set forth in <u>Section 7.3</u> of this Agreement, is not filed on or before May 29, 2008, the Hearing is not commenced on or before May 30, 2008, and the Stalking Horse Bid Order is not entered on or before June 2, 2008 or, in each case, such later dates as may be agreed to by the Purchaser;

(d) by the Sellers:

(i)    if any condition precedent to the obligations of the Sellers set forth in Sections 9.1 and <u>9.2</u> shall have become incapable of fulfillment other than as a result of a breach by any of the Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by the Sellers; or

(ii)    if there shall be a material breach by the Purchaser of any representation or warranty of or on behalf of the Purchaser, or any covenant or agreement of or on behalf of the Purchaser contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.2</u> and which breach cannot be cured or has not been cured by the earlier of (i) twenty (20) Business Days after the giving of written notice by the Sellers to the Purchaser of such breach and (ii) the applicable Termination Date.

3.5 <u>Procedure Upon Termination</u>.  In the event of a termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4, written notice thereof shall be given promptly to the other parties, and this Agreement shall thereupon terminate, and the purchase of all of the Purchased Assets shall be abandoned if terminated prior to the Closing.  If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

3.6 <u>Effect of Termination; Break-up Fee and Expense Reimbursement</u>.

(a) In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Purchaser or the Sellers; <u>provided, however</u>, that the obligations of the parties set forth in <u>Article XII</u> hereof shall survive any such termination and shall be enforceable hereunder.

(b) Nothing in this <u>Section 3.6</u> shall relieve the Purchaser or the Sellers of any liability for a breach of this Agreement prior to the date of termination.  The damages recoverable by the Sellers or the Purchaser, as applicable, in the event of such breach, shall include (but not be limited to) all reasonable and documented attorneys' fees reasonably incurred by the non-breaching party in connection with the transactions contemplated hereby.

(c) The Non-Disclosure Agreement shall survive any termination of this Agreement and nothing in this <u>Section 3.6</u> shall relieve the parties of their obligations under the Non-Disclosure Agreement.

(d) In the event of, and as a condition to, a termination of this Agreement pursuant to Section 3.4(b)(ii), the Sellers will pay the Purchaser, the sum of $5,750,000 (the "Break-up Fee") and the Expense Reimbursement Amount from the proceeds of the purchase price paid for the Purchased Assets by the Prevailing Bidder which payment shall (notwithstanding any other provision of this Agreement to the contrary (including Section 3.6(b)) constitute the sole and exclusive remedy of the Purchaser and Buyer Holdco with respect to the matters or circumstances giving rise thereto. The Seller's obligation to pay the Break-up Fee and the Expense Reimbursement Amount shall survive the termination of this Agreement and shall be given super priority administrative expense claim status, subject only to the liens and claims in favor of the DIP Lenders and the Carve-Out, pursuant to the terms of the Stalking Horse Bid Order.

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby, jointly and severally, make the representations and warranties in this Article IV to the Purchaser, except as qualified by sections in the Disclosure Schedule attached hereto, as the same may be amended, updated or modified with respect to any matter to the extent such matter first develops, occurs or arises after the Execution Date (regardless of when the Sellers have Knowledge of such event), subject to the Purchaser's right of termination pursuant to Section 9.3(a). Each such section of the Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article IV, and the representations and warranties set forth in this Article IV shall not survive the Closing.

4.1 Corporate Organization and Qualification. Each of the Sellers and each Non-Seller Entity is duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization listed on Section 4.1 of the Disclosure Schedule and is qualified and in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated or the business conducted by it require such qualification. Parent has previously made available to the Purchaser complete and correct copies of the certificate of incorporation and bylaws (or other comparable organizational documents) of each Seller and each Non-Seller Entity in effect on the Execution Date.

4.2 Subsidiaries.

(a)     Section 4.2 of the Disclosure Schedule sets forth a true and complete list of the names, jurisdictions of organization, and jurisdictions of qualification as a foreign entity of each of the Sellers and each Non-Seller Entity. Except as set forth in Section 4.2 of the Disclosure Schedule, all outstanding shares of capital stock of or other equity ownership interests in Leiner Services, Leiner Products and each of the Non-Seller Entities are owned, directly or indirectly, by Parent free and clear of all Encumbrances.

(b) Other than their respective Subsidiaries identified in Section 4.2 of the Disclosure Schedule, there are no other corporations, associations or other entities in which the Sellers or any of their Subsidiaries, or the Non-Seller Entities or any of their Subsidiaries, own,

17

of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

(c) Section 4.2 of the Disclosure Schedule lists the number of shares of capital stock of each Non-Seller Entity which are authorized and which are issued and outstanding and the number of shares of capital stock of such Non-Seller Entity owned directly or indirectly by Parent. All of the issued and outstanding shares of capital stock of each Non-Seller Entity have been duly authorized and validly issued and are fully paid and non-assessable. Parent owns, directly or indirectly, all of the issued and outstanding shares of capital stock of the Non-Seller Entities. There are no outstanding options, warrants, conversion rights, subscriptions or other rights entitling any Person to acquire or receive, or requiring any Non-Seller Entity to issue, any shares of its capital stock or securities convertible into, or exchangeable for, such shares of capital stock. There are no outstanding or authorized stock appreciation, phantom stock, stock plans or similar rights with respect to the Non-Seller Entities. Parent has full and exclusive power, right and authority, directly or indirectly by voting the shares of a Subsidiary, to vote all of the shares of capital stock of each Non-Seller Entity owned by it in accordance with the constituent documents of each such Non-Seller Entity, and Parent is not bound by any other document or agreement affecting or relating to its right to transfer or vote such shares of capital stock of any of the Non-Seller Entities.

4.3 Authority. Except for such authorization as is required by the Bankruptcy Court (including the Sale Order), and except as set forth on Section 4.3 of the Disclosure Schedule, each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Sellers in connection with the consummation of the transactions contemplated by this Agreement (the "Sellers' Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

4.4 Consents of Third Parties; No Conflict. Except as set forth on Section 4.4 of the Disclosure Schedule, no consent, waiver, approval, Order, License or authorization of, or declaration or filing with, or notification to, any Governmental Body is required on the part of any Seller or any Non-Seller Entity in connection with the execution and delivery of this Agreement or the Sellers' Documents, the compliance by the Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Sellers of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the notification requirements under, and the expiration or termination of all applicable waiting periods relating to, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder or the *Competition Act* (Canada) (and including any similar applicable foreign Laws) (collectively, the "HSR Act") and the conclusion of any proceeding that may have been filed thereunder, and (iii) such other consents, waivers, approvals, Orders, Licenses, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not, individually or in the aggregate, have a Material Adverse Effect. Subject to the entry of the Sale Order, the execution and delivery of this Agreement and the Sellers' Documents, the compliance by the Sellers with the provisions hereof and thereof, the consummation of the transactions contemplated hereby or

18

thereby or the taking by the Sellers of any other action contemplated hereby or thereby will not violate, conflict with or result in the breach of (i) any provision of the Certificate of Incorporation or By-laws of a Seller or a Non-Seller Entity or the Certificate of Formation or limited liability company agreement of a Seller or a Non-Seller Entity; (ii) any Material Contract to which any Seller or Non-Seller Entity is a party or by which it is bound; or (iii) any Law, rule or regulation of any Governmental Body having jurisdiction over any Seller or Non-Seller Entity.

4.5 <u>Absence of Certain Developments</u>. Except for actions taken in connection with the Chapter 11 Cases, as contemplated or expressly required or permitted by this Agreement, or as set forth in Section 4.5 of the Disclosure Schedule, since December 31, 2007, the Business has been conducted in the Ordinary Course of Business, and there has not been:

(a) any material damage, destruction or other casualty loss (whether or not covered by insurance) affecting the tangible Purchased Assets or tangible assets of any Non-Seller Entity, which losses in the aggregate exceed $750,000;

(b) any sale, lease or other disposition of any material asset of the Sellers or Non-Seller Entities with an original purchase price, when acquired by the Sellers or Non-Seller Entities, in excess of $1,000,000, other than in the Ordinary Course of Business, except for the disposition of obsolete or immaterial or worthless assets not necessary for the conduct of the Business by the Sellers or Non-Seller Entities;

(c) any incurrence, assumption or guarantee by the Sellers or Non-Seller Entities of any Indebtedness for borrowed money in excess of $50,000, in the aggregate, that would be binding upon the Purchaser;

(d) any creation or other incurrence of any Encumbrance (other than Permitted Encumbrances) on any asset of the Sellers or Non-Seller Entities that would be binding upon the Purchaser, except any incurrence, assumption or guarantee that is immaterial or has been agreed to in writing in advance by the Purchaser (excluding the Assumed Liabilities, and assuming entry of the Sale Order);

(e) (i) any increase in the salary, wages or other compensation of any Employee whose annual salary is, or after giving effect to such change would be, $100,000, or more, except for increases (x) in the Ordinary Course of Business or (y) pursuant to any Contract disclosed to Purchaser in the data room prior to the Execution Date but only to the extent required by the terms of such Contract; (ii) any establishment or modification of (A) targets, goals, pools or similar provisions in respect of any fiscal year under any Seller Plan or Employee Benefit Plan or any employment-related Contract or other compensation arrangement with or for Employees or (B) salary ranges, increase guidelines or similar provisions in respect of any Seller Plan or any employment-related Contract or other compensation arrangement with or for Employees; or (iii) any adoption, entering into or becoming bound by any Employee Benefit Plan, employment-related Contract or collective bargaining agreement, or amendment, modification or termination (partial or complete) of any Plan, employment-related Contract or collective bargaining agreement, except to the extent required by applicable Law and, in the event

19

compliance with applicable Law presented options, only to the extent the option which the Seller reasonably believed to be the least costly option;

(f) any physical damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the plant, real or personal property or equipment of any Seller or Non-Seller Entity used or held for use in the conduct of the Business in an aggregate amount exceeding $500,000;

(g) any material change in (A) any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of the Business or (B) any method of calculating any bad debt, contingency or other reserve of the Business for accounting, financial reporting or Tax purposes;

(h) any acquisition or disposition of any assets and properties used or held for use in the conduct of the Business, other than Inventory, trade fixtures, property, plant and equipment in the Ordinary Course of Business and other acquisitions or dispositions, not exceeding in either case $100,000 individually or $1,000,000 in the aggregate;

(i) capital expenditures or commitments for additions to property, plant or equipment used or held for use in the conduct of the Business constituting capital assets not exceeding the aggregate amounts provided for in the budgets set forth in Section 4.5 of the Disclosure Schedule;

(j) any transaction with any officer, director, or Affiliate of a Seller or any relative, beneficiary, spouse or Affiliate of such officer, director or Affiliate (i) outside the Ordinary Course of Business or (ii) other than on an arm's length basis;

(k) any distribution or dividend authorized or made by any Non-Seller Entity, or any redemption, repurchase, defeasance or acquisition of any equity interest in a Non-Seller Entity; or

(l) any entering into of a Contract to do or engage in any of the foregoing after the date hereof.

4.6 <u>Litigation</u>.    Except as set forth in Section 4.6 of the Disclosure Schedule, since December 31, 2007, there has been no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry or subpoena (collectively, "<u>Actions</u>"), pending or, to the Knowledge of the Sellers, threatened against any Seller or any Non-Seller Entity, or any of them, or any property or asset of any Seller or Non-Seller Entity.    Other than Orders issued by the Bankruptcy Court in connection with the Chapter 11 Cases, there are no Orders outstanding against any Seller or Non-Seller Entity.    To the Knowledge of the Sellers, there are no facts or circumstances that could reasonably be expected to give rise to any Action that would be required to be disclosed under the foregoing sentences of this Section 4.6.

4.7 <u>Intellectual Property</u>.    Section 4.7 of the Disclosure Schedule sets forth a true, complete and correct list of (a) all of the material registrations and patents (and applications for the foregoing) for Owned Intellectual Property, and (b) all IP License Contracts, except for off-the-shelf or commercially available software and licenses implied in the sale of such

software with a total replacement cost of $50,000 or less in the aggregate. Except as disclosed in Section 4.7 of the Disclosure Schedule, (i) the Sellers or Non-Seller Entities have the right to use the Owned Intellectual Property, (ii) all registrations with and applications to Governmental Bodies in respect of such Intellectual Property are valid and in full force and effect and are not subject to the payment of any Taxes (but not including maintenance fees) in excess of $5,000 in the aggregate or unpaid, due and owing maintenance fees or the taking of any other actions by any Seller or Non-Seller Entity to maintain their validity or effectiveness; (iii) the Sellers and Non-Seller Entities have taken reasonable security measures to protect the secrecy, confidentiality and value of its trade secrets in respect of the Business, (iv) the Sellers and Non-Seller Entities are not, nor have any of them received any notice that any of them are, in default (or with the giving of notice or lapse of time or both, would be in default) under any IP License Contract, (v) to the Knowledge of the Sellers, no Owned Intellectual Property is being infringed by any other Person and (vi) there are no restrictions on the direct or indirect transfer of any Contract, or any interest therein, held by any Non-Seller Entity in respect of such Intellectual Property. The Sellers and Non-Seller Entities have not received notice that any Seller or Non-Seller Entity is infringing any Intellectual Property of any other Person in connection with the conduct of the Business, no claim is pending or, to the Knowledge of the Sellers, has been made to such effect that has not been resolved and, to the Knowledge of the Sellers, none of the Sellers and Non-Seller Entities is infringing any Intellectual Property Rights of any other Person in connection with the conduct of the Business. To the Knowledge of the Sellers and except as set forth on Section 4.7 of the Disclosure Schedule, there are no pending or threatened actions, causes of action, claims, suits, proceedings, Orders, writs, injunctions, or decrees which involve a claim of infringement, unauthorized use, or violation of the Intellectual Property by any Person against any Seller or any Non-Seller Entity, or challenging the Sellers' or any Non-Seller Entity's ownership or use, validity or enforceability of, any Intellectual Property.

4.8 Contracts and Commitments.

(a) Section 4.8(a) of the Disclosure Schedule sets forth all material executory Contracts relating to the Purchased Assets to which any of the Sellers is a party or by which it is bound as of the Execution Date (the "Seller Contracts"). Except as set forth on Section 4.8(a) of the Disclosure Schedule, none of the Sellers has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by a Seller under any Seller Contract, which default would preclude the assignment of such Seller Contract subject to the provisions of Section 365 of the Bankruptcy Code. Except as set forth in Section 4.8(a) of the Disclosure Schedule and Section 8.3 of this Agreement and assuming (x) the entry of the Sale Order and (y) due execution by the other party or parties thereto, as of the Closing Date, each Seller Contract will be in full force and effect and enforceable in accordance with its terms.

(b) Section 4.8(b) of the Disclosure Schedule sets forth all Contracts to which any of the Non-Seller Entities is a party or by which it is bound as of the Execution Date that cannot be terminated by any Non-Seller Entity within 30 days or involve annual payments in excess of Canadian $100,000 (the "Vita Material Contracts"). With respect to each Vita Material Contract: (i) the Contract is legal, valid, binding, enforceable, and in full force and effect; (ii) the Contract will continue to be legal, valid, binding, enforceable, and in full force and effect on substantially identical terms following the Closing as it was prior to the Closing (subject to actions and

21

omissions of the Purchaser); (iii) to the Knowledge of the Sellers, no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, material modification, or acceleration of payment by the Sellers, under the Contract, and (iv) no party thereto has repudiated in writing any provision of the Contract.

(c) The Contracts listed in Sections 4.8(a) and 4.8(b) of the Disclosure Schedule are collectively referred to as the "Material Contracts". The Sellers have heretofore delivered or made available to the Purchaser true and complete copies of all Material Contracts that are in writing, or material summaries or terms thereof, including all amendments, modifications, schedules and supplements thereto and all waivers (including descriptions of oral waivers) with respect thereto.

4.9 Material Licenses.

(a) All of the Licenses that are necessary for the operation of the Business and the Purchased Assets as currently conducted are identified in Section 4.9 of the Disclosure Schedule ("the Material Licenses") including, without limitation Licenses issued or granted to each of the Sellers and Non-Seller Entities by (A) the United States Food and Drug Administration ("FDA Permits"), (B) Health Canada ("Health Canada Permits") and (C) any local government regulating food and drug businesses, products or services or authorizing any of the Sellers or Non-Seller Entities to place facilities within the boundary of such local government.

(b) Except as set forth in Section 4.9 of the Disclosure Schedule, each of the Sellers and Non-Seller Entities is in compliance in all material respects with (i) its obligations under each of the Material Licenses and (ii) the rules and regulations of the Governmental Body issuing such Material Licenses.

4.10   Brokers and Finders.   Except as set forth in Section 4.10 of the Disclosure Schedule, the Sellers and Non-Seller Entities have not employed, and to the Knowledge of the Sellers, no other Person has made any arrangement by or on behalf of the Sellers or Non-Seller Entities with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11   Title to Purchased Assets.   Except as set forth in Section 4.11 of the Disclosure Schedule, and assuming entry of the Sale Order, one or more of the Sellers have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) good title to the Purchased Assets (other than the Real Property) that are owned by the Sellers, free and clear of all Encumbrances except Permitted Encumbrances.  Each Non-Seller Entity has good title to its respective assets, free and clear of all Encumbrances except Permitted Encumbrances. The Equipment and tangible personal property of the Sellers and Non-Seller Entities are in good condition and working order, reasonable wear and tear excepted.

4.12   Tangible Personal Property.  Section 4.12 of the Disclosure Schedule sets forth all Material Contracts that constitute leases of tangible personal property ("Personal Property

Leases") involving annual payments in excess of $75,000 relating to personal property used by any of the Sellers or Non-Seller Entities in the Business or to which any Seller or Non-Seller Entity is party or by which the properties or assets of any of the Sellers or Non-Seller Entities are bound. Except as set forth in Section 4.12 of the Disclosure Schedule, none of the Sellers or Non-Seller Entities has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by such Seller or Non-Seller Entity under any of the Personal Property Leases.

4.13    Real Property.

(a) Section 4.13 of the Disclosure Schedule contains a complete and correct list of all Owned Real Property setting forth the address or other information sufficient to identify specifically such Owned Real Property. Except as set forth on Section 4.13 of the Disclosure Schedule,

(i)    the Seller or Non-Seller Entity has insurable, fee simple title to the Owned Real Property, free and clear of any Encumbrances other than Permitted Encumbrances;

(ii)    the Seller or Non-Seller Entity has not leased or granted to any Person the right to use or occupy the Owned Real Property that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date;

(iii)    there are no outstanding options or rights of first refusal to purchase the parcel of real property or any portion thereof or interest therein; and

(iv)    there are no parties (other than the Sellers or Non-Seller Entities) in possession of the parcel of real property, other than tenants under any Material Contract who are in possession of space to which they are entitled.

(b) Section 4.13 of the Disclosure Schedule sets forth a complete and correct list of all Leased Real Property specifying the address or other information sufficient to identify all such Leased Real Property. The Sellers have delivered to the Purchaser true, correct and complete copies of each of the leases, including all amendments, modifications, supplements and renewals thereof. Except as set forth in Section 4.13 of the Disclosure Schedule, no Seller or Non-Seller Entity has subleased or granted to any Person the right to occupy the Leased Real Property.

4.14    Employee Benefit Plans.

(a) Section 4.14 of the Disclosure Schedule identifies each Seller Plan, and a true and complete copy of each Seller Plan (and any document ancillary thereto), including where applicable, trust documents, group annuity contracts, plan amendments, insurance policies or contracts, participation agreements, employee booklets, administrative services agreements, summary plan descriptions, compliance and non-discrimination tests for the last two plan years, and material communications with Employees or Governmental Bodies relating thereto has been furnished to the Purchaser.

23

(b) Except as set forth on <u>Section 4.14</u> of the Disclosure Schedule, no Seller or Non-Seller Entity, nor any ERISA Affiliate, has ever maintained, established, sponsored, participated in, contributed to, or is obligated to contribute to, or otherwise incurred any obligation or liability (including any contingent liability) (i) under any "multiemployer plan" (as defined in Section 3(37) of ERISA or under Canadian Law), (ii) to any "pension plan" (as defined in Section 3(2) of ERISA) subject to Section 302 or Title IV of ERISA or Section 412 of the Code. No Seller or Non-Seller Entity, nor any ERISA Affiliate, has any actual or potential withdrawal liability (including any contingent liability) for any complete or partial withdrawal (as defined in Sections 4203 and 4205 of ERISA) from any multiemployer plan.

4.15    <u>Compliance with Law</u>.

(a) To the Knowledge of the Sellers and except as set forth in Section 4.15 of the Disclosure Schedule, each Seller and each Non-Seller Entity is in compliance in all material respects and since (i) the Petition Date, as to each Seller, and (ii) since January 1, 2005, as to each Non-Seller Entity, has been in compliance, in all material respects, with all applicable Laws to which the Business or the Purchased Assets are subject, and no action, suit, proceeding, hearing, charge, complaint, claim, demand or notice has been filed or commenced against the Sellers and the Non-Seller Entities, or any of them, alleging any material failure so to comply with any such Laws.

(b) All products for which a Non-Seller Entity owns the Canadian marketing authorizations identified in <u>Section 4.15</u> of the Disclosure Schedule are manufactured in compliance with applicable current Good Manufacturing Practices, the *Food and Drugs Act* (Canada) and associated regulations, and all applicable Health Canada guidelines, and all other applicable Laws concerning the packaging, labeling, manufacture, distribution or sale of drugs. To the Knowledge of the Sellers', none of such products are currently or have been subject to any investigations, actions, or other proceedings by Health Canada or comparable provincial or local authorities, or pursuant to any other applicable Laws or regulations relating to the storage, packaging, labeling, manufacture, distribution or sale of drugs. Except as disclosed in <u>Section 4.15</u> of the Disclosure Schedule, none of the Non-Seller Entities, the products manufactured by a Non-Seller Entity or the facilities in which the products are manufactured are now subject (and none has been subject since January 1, 2005) to any warning letter, injunction or request for an injunction, consent decree, adverse inspection, adverse finding, recall, request for corrective or remedial action, investigation for a possible recall, other investigation, safety alert, penalty assessment, audit or other compliance or enforcement action by the FDA, Health Canada, or any other Governmental Body having legal responsibility for the regulation of the products. None of the Non-Seller Entities, their respective management or employees, or any third party retained by them has made on their behalf any false statement or material omission in submissions to or filings with the FDA, Health Canada or any other Governmental Body having responsibility for regulation of the products manufactured or sold by the Non-Seller Entities.

4.16    <u>Product Liability</u>.  Except as set forth in Section 4.16 of the Disclosure Schedule, there are no pending or, to the Knowledge of the Sellers, threatened actions, causes of action, claims, suits, proceedings, or injunctions which involve a claim relating to a harm allegedly caused by the ownership, possession, or use of any product manufactured, sold, leased, or delivered by any Seller or Non-Seller Entity. Except as set forth on Section 4.16 of the

24

Disclosure Schedule, no Seller or Non-Seller Entity has received written notice of any such actual or threatened claim relating to a harm allegedly caused by any such products by any attorney for any Person against any Seller or Non-Seller Entity.

4.17    Excluded Assets.  None of the Excluded Assets are material to the conduct and the operation of the Business in the Ordinary Course of Business.

4.18    Certain Entities.  Except as set forth in Section 4.18 of the Disclosure Schedule, none of LHP, 6062199 Canada Inc., Westcan Pharmaceuticals Limited, VH Vita Holdings Inc., nor LHP Holding Corp. is or has been engaged in the Business or has title to any assets used or useful in the conduct of the Business. The Sellers are unable to locate the share certificates for the 337 shares of capital stock of Sterling Construction Co. identified on Section 4.2 of the Disclosure Schedule owned by the Sellers (the "Sterling Shares"). The Sterling Shares have a market value of less than $10,000.

4.19    Genuineness and Authenticity of Minutes.  Since January 1, 2003, the minute books of the Non-Seller Entities and of the Sellers made available to Purchaser for its review pursuant to Section 8.2(a) contain accurate and complete records in all material respects of all meetings held by such entities, its board of directors, the committees thereof and its stockholders (subject in all cases to redaction as permitted by Section 8.2(a)).

4.20    Insurance.  Except as set forth on Section 4.20 of the Disclosure Schedule, the Sellers and Non-Seller Entities have in effect and have continuously maintained insurance coverage on an "occurrence" basis for all of their operations, personnel and assets and for the Business.  A complete and accurate list of all such insurance policies is included in Section 4.20 of the Disclosure Schedule.  Section 4.20 of the Disclosure Schedule also includes a list of any pending insurance claims relating to any Seller and/or any Non-Seller Entity.  No Seller or Non-Seller Entity is in default or breach with respect to any provision contained in any such insurance policies, nor has any of them failed to give any notice or to present any claim thereunder in due and timely fashion.

4.21    Affiliate Transactions.  Except on an arm's length basis, to the Knowledge of the Sellers no officer, director, Affiliate of any Seller or Non-Seller Entity, nor any relative, beneficiary, spouse or Affiliate of the foregoing, provides or causes to be provided any assets, services or facilities used or held for use in connection with the Business, and the Business does not provide or cause to be provided any assets, services or facilities to any of the foregoing.

4.22    Employees; Labor Relations.

(a) Section 4.22 of the Disclosure Schedule contains a list of the name of each Employee having an annual base salary or wages of at least $100,000 at the date hereof, together with such Employee's position or function, annual base salary or wages and any incentive or bonus arrangement, annual vacation accrual in hours, unused vacation hours remaining as of May 23, 2008 and unused sick leave remaining as of May 23, 2008; annual sick day entitlement, sick days taken and sick days remaining in effect on such date with respect to such Employee. Section 4.22 of the Disclosure Schedule includes and specifically categorizes  (i) all active Employees, (ii) all Employees who are on lay-off status but have recall rights pursuant to any